**Louisa MACLEAN, f/k/a Louisa Middleton, Appellant/Cross–Appellee**

v.

**Lawrence MIDDLETON, Appellee/Cross–Appellant.**

Nos. 2011–CA–000267–MR, 2011–CA–000268–MR, 2011–CA–001076–MR, 2011–CA–001160–MR.

Court of Appeals of Kentucky.

Jan. 3, 2014.

As Modified Jan. 10, 2014.

Marcia L. Sparks, Louisville, KY, for Appellant/Cross–Appellee.

J. Russell Lloyd, Donna J. Foust, Louisville, KY, for Appellee/Cross–Appellant.

Before MAZE, STUMBO AND TAYLOR, Judges.

## OPINION

MAZE, Judge:

This appeal and cross-appeal arises from a judgment of the Jefferson Family Court which dissolved the marriage between Louisa Maclean and Lawrence Middleton. Maclean challenges the trial court's findings and orders which characterized Trust distributions as Middleton's non-marital property, divided marital property, allocated debt, and interpreted a prior support order. Middleton argues that the trial court erred in its determination of his non-marital interest in the marital residence, allocation of debt, calculation of child support, and awards of maintenance, attorney fees and costs to Maclean. Finding no clear error or abuse of discretion, we affirm.

## I. Facts and Procedural History

Louisa Maclean and Lawrence Middleton were married on April 24, 1999. On the date of the marriage, Middleton was 48 years of age, and Maclean was 36. The parties are the parents of two minor children, A.M.M., born in 2000, and S.C.M., born in 2002.

At the time of the marriage, Middleton was employed as a financial advisor with Hilliard Lyons. He reported income ranging from a high of $583,393 in 2003 following a low of $238,472 in 2002. In 2005, Middleton left his employment with Hilliard Lyons to become a 20% shareholder of Atlas Brown, Inc. His base salary was $275,000, and the parties invested $444,000 in Atlas Brown at its creation. In December 2006, Middleton was terminated as president and chief compliance officer of Atlas Brown. However, he continued as a board member and shareholder of Atlas Brown and he received substantial income from that investment and other sources. Maclean was employed with Commonwealth Bank at the time of the marriage. Her highest income prior to the marriage was $28,000 per year. Following the marriage, she did not work outside the home.

The parties separated in May of 2006 and Maclean filed this petition for dissolution of the marriage in June of that year. After separation, Maclean was self-employed as the sole shareholder of Spring House Interiors, Inc., earning $1,462 per month. She also had other income through free-lance and contracting positions. From 2006 until October of 2007, Middleton paid Maclean combined maintenance and child support totaling $8,500 per month. Thereafter, Middleton paid temporary maintenance of $5,000 per month. In the final decree, the trial court found that Maclean was voluntarily underemployed and capable of earning at least $2,100 per month. Based on these findings and the allocation of property and debt, the trial court directed Middleton to pay Maclean $2,500 in maintenance for twelve months.

By agreement, the parties settled the issues relating to the care, custody and support of the two children. The primary disputed issue concerned the characterization of distributions to Middleton from a family trust. Middleton also claimed a substantial non-marital interest in the marital residence. There were also disputed issues concerning child support, division of marital property, assignment of responsibility for indebtedness, maintenance and assignment of attorney fees and costs. The parties agreed to submit these issues to a Master Commissioner, and the trial court appointed Hon. B. Mark Mulloy to serve in that capacity.

The parties appeared before the Master Commissioner during a series of hearings on these issues from October 2007 through October 2008. The Master Commissioner issued his report and findings on February 3, 2009. Both parties filed exceptions to various aspects of the Master Commissioner's report. The Master Commissioner filed a subsequent report addressing those exceptions on March 16, 2009.

These matters were then submitted to the trial court for final adjudication. On May 11, 2009, the trial court entered a decree dissolving the marriage. After additional proceedings and hearings, the trial court entered findings of fact, conclusions of law on November 8, 2010. The court adopted the Master Commissioner's findings and recommendations and entered final judgment resolving the disputed issues per the Master Commissioner's report.

Both parties filed motions to alter, amend or vacate the judgment pursuant to CR 59.05, which the trial court denied. This appeal and cross-appeal followed. Additional facts will be set forth below as necessary.

## II. Preliminary Matters

■ As an initial matter, the dissent takes the position that the trial court lacked the authority to appoint the Master Commissioner in this case. Consequently, the dissent concludes that the trial court's order adopting the Master Commissioner's findings of fact and conclusions of law are void *ab initio* and must be set aside. We do not take issue with the dissent's analysis concerning the lack of statutory or procedural authority for the process used in this case. Nevertheless, we do not agree with the dissent's conclusion that this matter amounts to a jurisdictional error which this Court may raise on its own motion without prompting by either party.

■ As a general rule, an alleged failure to make adequate findings of fact must be brought to the trial court's attention as required under CR 52.02 or CR 52.04. Otherwise, a party has waived its right to raise the issue on appeal. *Cherry v. Cherry*, 634 S.W.2d 423, 425 (Ky.1982). In this case, neither party objected to the appointment of the Master Commissioner in this case. To the contrary, both parties agreed to the submission of the disputed issues to the Commissioner.

■ Moreover, we disagree with the dissent that the trial court improperly delegated its decision-making responsibility. As was the situation in *Bingham v. Bingham*, 628 S.W.2d 628 (1982), the record clearly shows that the trial court was thoroughly familiar with the proceedings and facts of the case and that it had prudently examined the proposed findings and conclusions. Although the Commissioner actually heard must of the evidence presented by the parties, a thorough record was made of those evidentiary hearings. The Commissioner's recommended findings were the subject of lengthy proceedings before the trial court. The trial court extensively discussed the issues raised by parties in their respective objections to the Commissioner's recommended findings. After thorough review, the trial court incorporated those findings into its judgment. Under the circumstances, we cannot find that the trial court abdicated its fact-finding and decision-making responsibilities to such a decree that its judgment must be set aside on this basis alone.

In the alternative, we also note that the trial court has the discretion to appoint experts who may assist the court in its fact-finding duties. Kentucky Rule of Evidence (KRE) 706(a). While Mulloy was designated as a "Master Commissioner" in this case rather than an expert witness, the practical effect was the same. The court appointed Mulloy, a well-qualified expert in the field, to assist it in resolving

the complicated financial issues which were disputed in this dissolution case. Furthermore, we also disagree with the dissent that the trial court improperly delegated its decision-making responsibility. Although the precise procedure used may not have been correct, the appointment was within the discretion of the trial court.

■ Along similar lines, we also agree with the dissent that the $52,000 fee paid to the Master Commissioner in this case exceeds that total amount which would be authorized under CR 53.07. It is entirely appropriate for the dissent to comment on the excessive amount of the fee and to advise trial courts of the need to comply with the requirements of the rule in the future. However, the fee was awarded as part of an agreement by the parties, and the trial court directed payment of that amount as part of its allocation of attorney fees under KRS 403.220. On the other hand, if Mulloy is viewed as an appointed expert, then his compensation may be allocated in the same manner as costs without regard for the limitation in CR 53.07. KRE 706(b). In any event, neither party has challenged this aspect of the trial court's judgment. Consequently, we have no basis for reversing the award *sua sponte.*

■ Finally, the dissent correctly notes the lack of any statutory basis for the sealing the record in this case. Although trial courts have the authority to seal the record where there are interests favoring nondisclosure of court file materials, there is a strong presumption in favor of public access to court records. *Roman Catholic Diocese of Lexington v. Noble,* 92 S.W.3d 724, 730–731, 734 (Ky.2002). *See also Cline v. Spectrum Care Academy, Inc.,* 316 S.W.3d 320 (Ky.App.2010). We certainly agree that court records should not be sealed as a matter of routine practice simply at the request of the parties. But in the absence of any challenge to the order, the issue is not before this Court and we have no authority to disturb the trial court's decision to seal the record.

### III. Issues

We now turn to the issues raised by the parties in these appeals. In her direct appeal, Maclean raised challenges the trial court's decisions on five issues: (1) the designation of Trust settlement proceeds as non-marital; (2) the valuation of the marital residence for purposes of determining marital equity; (3) the sufficiency of findings concerning the division of personal property from the marital residence; (4) the allocation of marital debt; and (5) the denial of her claim for reimbursement of medical expenses and health insurance Premiums incurred while this action was pending.

Middleton also presents five issues in his cross-appeal: (1) the sufficiency of the trial court's findings concerning his non-marital contributions to the acquisition and renovation of the marital residence; (2) the allocation of marital debt; (3) the award of post-decree maintenance to Maclean; (4) the calculation of Maclean's earning capacity for purposes of setting child support; and (5) the award of attorney fees and costs to Maclean.

For the most part, the issues presented in the direct and cross-appeals are distinct and can be addressed separately. However, the parties' disputes involving the marital residence and the allocation of debt are factually intertwined. Therefore, we shall address those issues together.

### IV. Direct Appeal and Common Issues

#### A. Characterization of Distributions to Middleton from Trust.

■ The primary dispute in this case concerns distributions to Middleton under a series of trusts created by his maternal great-grandfather, Lawrence Jones. In 1933, Jones established a series of *inter*

*vivos* trusts for the benefit of his three daughters and their descendents (the Daughters' Trust). He established a similar series of trusts for the benefit of his son, Lawrence Jones, Jr., and his descendants. Those trusts became irrevocable in 1935 and became testamentary trusts in 1941 under Jones's will. Middleton is a descendent of Lawrence Jones, Jr., who predeceased his father.

Over the decades, many issues involving the administration of the Daughter's Trust have been raised and have been the subject of agreements and private resolutions among the beneficiaries, including a 1980 agreement. In 1996, further issues regarding the administration of income interests were raised and addressed in an arbitration proceeding and order. The order settled a number of long-standing issues, most notably regarding the continued validity of the trusts under the Rule Against Perpetuities and whether the descendants of the Son's Trust could be considered as remainder beneficiaries under the Daughters' Trust. The arbitration order also required the trustee to institute a declaratory judgment action to confirm the agreement and award.

Pursuant to this latter provision, PNC Bank, as trustee, instituted a declaratory judgment action in 2004: (1) to determine whether the Daughter's Trust violates the Rule Against Perpetuities; (2) to confirm the 1996 Arbitrator's Opinion and Award; (3) to declare whether the descendants of Lawrence Jones, Jr. are included in the class of remainder beneficiaries under the Daughters' Trust; and (4) to grant permission to transfer the trust *situs* to Delaware. Lawrence and his brother Charles Middleton were named parties to that action. In addition, they filed a separate action raising various claims against the trustee. The separate actions were ultimately consolidated.

After several years of litigation and mediation, the beneficiaries under the various trusts entered into a Settlement Agreement and Release on December 28, 2007. In pertinent part, the Settlement Agreement stipulated that the Middleton brothers were deemed to be remaindermen under the Daughters' Trust. Beginning in March of 2008, the Middleton brothers began receiving distributions from the Daughters' Trust. As of the date of trial, those distributions to Lawrence Middleton have totaled more than $1,800,000.

Maclean correctly notes that all property acquired by either spouse subsequent to the marriage is marital property under KRS 403.190(3). As a result, she argues that Middleton's right to receive these distributions arose from his participation in the litigation during the marriage and thus should be considered as marital property. The Master Commissioner and the trial court disagreed, concluding that Middleton's right to receive the distributions arose from his status as a remainder beneficiary of the Daughters' Trust. Consequently, the court concluded that the distributions constitute property acquired by "devise or descent," and are thus exempt from characterization as marital property under KRS 403.190(2)(a).

The parties agree that the disposition of the parties' property is governed by KRS 403.190. In *Travis v. Travis*, 59 S.W.3d 904, 909 (Ky.2001), the Kentucky Supreme Court set out a three-part test for the trial court to use to divide the parties' property: (1) the trial court first characterizes each item of property as marital or non-marital; (2) the trial court then assigns each party's non-marital property to that party; and (3) finally, the trial court equitably divides the marital property between the parties. *Id.* at 909. In *Sexton v. Sexton*, 125 S.W.3d 258 (Ky.2004), the Court went on to dis-

cuss the application of the "source of funds" rule to this process:

> An item of property will often consist of both nonmarital and marital components, and when this occurs, a trial court must determine the parties' separate nonmarital and marital shares or interests in the property on the basis of the evidence before the court. Neither title nor the form in which property is held determines the parties' interests in the property; rather, Kentucky courts have typically applied the "source of funds" rule to characterize property or to determine parties' nonmarital and marital interests in such property. The "source of funds rule" simply means that the character of the property, i.e., whether it is marital, nonmarital, or both, is determined by the source of the funds used to acquire the property.

*Id.* at 265.

■ On appeal, this Court applies a two-tiered standard of review to the question of whether an item is characterized as marital or non-marital. The trial court's factual findings are reviewed under the clearly erroneous standard of CR 52.01. However, the court's ultimate legal conclusions are reviewed *de novo* as an issue of law. *Smith v. Smith,* 235 S.W.3d 1, 6–7 (Ky.App.2006).

Maclean argues that the trial court failed to properly apply the source of funds rule to distributions which were paid to Middleton. Maclean presented extensive expert testimony to support her claim that Middleton would not have received any of these distributions but for his participation in the 2004 litigation. Middleton had not participated in the 1980 family discussions or the 1996 arbitration concerning the Daughters' Trust. In addition, he was not in the line of anticipated beneficiaries for the Daughters' Trust. Furthermore, it is unlikely he would have been included in the class of remainder beneficiaries due to the Trust's failure to comply with the Rule Against Perpetuities. Based on these facts, Maclean contends that Middleton's inclusion in that latter class came as a direct result of his active participation in the 2004 litigation.

It is undisputed that distributions were paid to Middleton out of the Daughters' Trust. The Trust itself is clearly non-marital, having been created and funded long before the marriage. Generally, any distributions from such a trust would be considered as a devise or inheritance, which is specifically exempted from classification as marital property under KRS 403.190(2)(b). Under that statute, income from a non-marital trust is also non-marital "unless there are significant activities of either spouse which contributed to the increase in the value of said property and the income earned therefrom. . . ." However, Maclean does not claim that the distributions constitute income from the Trust.

The complicating factor in this case is that Middleton's status as a remainder beneficiary does not arise directly from the Trust instrument, but from his participation in the 2004 litigation and his settlement with the trustee. In addition, Maclean also notes that Middleton used marital funds to pursue the litigation. Consequently, she argues that those expenditures constitute a marital contribution to the value of the non-marital trust. Maclean further argues that the distributions constitute settlement proceeds from litigation arising during the marriage, rather than distributions from a non-marital trust to a remainder beneficiary. As a result, she maintains that the source of the distributions should have been characterized as marital property and subject to division as such.

While Maclean presents an interesting argument in a unique situation, we conclude that the trial court properly charac-

terized the distributions as Middleton's non-marital property. The distributions were paid to Middleton based upon his status as a remainder beneficiary under the Daughters' Trust. Middleton's expenditure of marital funds for the litigation does not change the source of the distributions from the Trust. At most, Maclean would only be entitled to an equitable recovery of marital funds which Middleton expended to obtain this non-marital asset. However, she has not raised such a claim in this action.

■ Furthermore, even if the distributions are treated as proceeds from settlement of litigation, Middleton presented sufficient evidence to establish that those distributions are non-marital in nature. Typically, the character of proceeds from a judgment or settlement of a legal claim will be determined based upon when the underlying claim arose and the purpose for which the judgment or settlement was awarded. In *Weakley v. Weakley*, 731 S.W.2d 243 (Ky.1987), the issue involved the character of settlement proceeds from a personal injury claim based upon an automobile accident occurring during the marriage. The Kentucky Supreme Court held that the character of the proceeds is determined by whether the proceeds replace monies which would have been acquired during the marriage. Thus, the Court held that a personal injury award is marital to the extent that it is made for loss of earnings and permanent impairment to earn money during the marriage. *Id.* at 244. However, the award is non-marital to the extent that it made for permanent impairment to earn money following dissolution of the marriage. *Id.* Similarly, recovery for pain and suffering is a claim which is personal to the injured person. As a result, such damages are non-marital in nature. *Id.*

Although the current situation is much different from the facts presented in *Weakley,* the same analysis applies. The settlement proceeds were paid to Middleton based upon his status as a remainder beneficiary in the Daughters' Trust. Although that status was formally determined as part of the settlement of litigation during the marriage, the underlying claim arose from Middleton's potential interest in the Trust. That interest existed before and outside of the marriage. Therefore, the trial court properly characterized the distributions as Middleton's non-marital property.

### B. *Marital Residence*

Both parties next challenge the trial court's valuation and allocation of the proceeds from the sale of their most recent marital residence, located at 10 River Hill Road in Louisville (the River Hill Road property). Middleton argues that he proved substantial non-marital contributions to that the River Hill Road property, but the Master Commissioner imposed an unreasonably high standard for tracing those contributions. In her appeal, Maclean asserts that Middleton's tactics during the litigation significantly delayed the sale of the residence, resulting in a much lower sale price during the recession. Maclean contends that the reduction in the sale price should be charged against Middleton's share of the marital proceeds.

### 1. *Tracing Issues*

In his cross-appeal, Middleton claims a significant non-marital interest in the River Hill Road property through a complex thread of contributions from the proceeds of sales of prior residence and other non-marital contributions. The Master Commissioner made extensive findings concerning Middleton's efforts to trace his non-marital contributions into the River Hill Road property, which can be summarized as follows:

1. In 1998, prior to the parties' marriage, Middleton acquired real

property located at 1514 Goshen Lane in Goshen KY (the Goshen Lane property). He purchased the property for $292,500, paying $66,002.39 at closing and financing the balance. On April 26, 1999, two days following the parties' marriage, Middleton sold the Goshen property. After payment of the first and second mortgage debts, he received a check for $1,927.07.

2. In 1999, also prior to the parties' marriage, Middleton acquired real property located at 431 Lightfoot Road in Louisville (the Lightfoot Road property). He purchased the property for $511,000, paying $106,532.06 at closing and financing the balance of the purchase. Middleton states that he expended $32,052.71 from a Hilliard Lyons account for improvements and renovations to the property.

3. The Master Commissioner found that the $1,927.03 cash received by Middleton from the sale of the Goshen Lane property was his nonmarital property. However, Middleton did not attempt to trace those proceeds into any existing asset. The Master Commissioner further found that Middleton adequately traced $106,532 in non-marital funds into his purchase of the Lightfoot Road property. This amount includes the $60,563.79 from the second mortgage on this property on the Goshen Lane property, and an additional $46,970 in separate funds.

4. The parties sold the Lightfoot Road property on June 5, 2001 for $645,000. After payment of mortgage debts, the parties received a check for $222,214.54. The Master Commissioner found that Middleton had adequately traced his initial $106,532 non-marital contribution into these proceeds. However, the Master Commissioner found insufficient evidence to establish that the increase in value of the Lightfoot Road property was attributable solely to Middleton's non-marital contributions of the down payment or his contributions toward renovations.

5. On May 18, 2001, the parties acquired real property located at 319 Mockingbird Hill Road in Louisville (the Mockingbird Hill Road property). They purchased the property for $635,000, paying $11,158.91 at closing and financing the balance of the purchase. Shortly thereafter, the parties refinanced the debt for $500,000. As part of the re-financing, they paid $148,809.44; a sum that included settlement charges as well as $135,000 in debt reduction on the property. Middleton alleges that this amount came from the $222,214.54 in proceeds of the sale of the Lightfoot Road property two days earlier. He also alleges that he expended $54,506.63 from a Hilliard Lyons account for improvements and renovations to the property.

6. The Master Commissioner found that the source of the $148,809.44 payment to refinance the Mockingbird Hill Road property was the $222,214.54 received at the closing of the Lightfoot Road property two days earlier. Of that $222,214.54, Middleton established that $106,532 is his non-marital portion of the funds. This represents 48% of the total proceeds from the sale of the Lightfoot Road property. The remaining proceeds are marital property.

7. When the parties paid $135,000 toward the debt reduction on the Mockingbird Hill Road property, the $64,800 (48%) of that sum was traceable to Middleton's non-marital interest, and the remaining amount was marital. However, the Master Commissioner found insufficient evidence to establish that the increase in value of the Mockingbird Hill Road property was attributable solely to Middleton's non-marital contributions toward renovations.

8. The parties sold the Mockingbird Hill Road property on September 16, 2002 for $725,000. After payment of the first and second mortgage debts, the parties received a check for $49,125.71.

9. On July 29, 2002, the parties acquired real property located at 10 River Hill Road in Louisville for $750,000. They paid $117,367.66 at closing and financed the balance of the purchase. Middleton alleges that the source of the down-payment was proceeds from the second mortgage on the Mockingbird Hill Road property. He also claimed non-marital contributions to renovation expenses on the River Hill Road property totaling $311,621.18.

10. The Master Commissioner concluded that funding from the second mortgage debt on the Mockingbird Hill Road property were used for the down-payment on the River Hill Road property.

11. The Master Commissioner would have apportioned the tracing of Middleton's $64,800 interest in the same ratio as the proceeds received from Mockingbird Hill Road property. The $117,367.66 second mortgage debt used to purchase the River Hill Road property represents 70.50% of the total proceeds, and the $49,125.71 represents the remaining 29.50%. That apportionment would have restored to Middleton $19,116 (29.50%) from the proceeds check; and would have further credited him with a non-marital interest of $45,684 (79.50%) from the proceeds of the second mortgage. Thus, Middleton has non-marital contributions in the River Hill Road property totaling $64,800.

12. Finally, the Master Commissioner found that Middleton had presented insufficient evidence to establish that the increase in value of the River Hill Road property was attributable to his expenditures of non-marital funds toward the renovations.

13. On July 29, 2002, the parties acquired the River Hill Road property. They paid $117,367.66 at closing and financed the balance of the purchase. Middleton alleges that the source of that payment was the proceeds from a second mortgage on the Mockingbird Hill Road property. He also alleges that the parties.

14. Based upon the final sale price of $1,175,000 in 2009, the parties received net proceeds of $484,215. After deducting Middleton's non-marital interest of $64,800, the trial court divided the remaining marital equity of $419,415 equally between the parties.

The central issue in Middleton's claim concerns the sufficiency of his evidence tracing his non-marital contributions into the current value of the most-recent marital residence. The concept of "tracing" is not expressly created by statute, but it is strongly implied by the presumptions cre-

ated in KRS 403.190. As previously noted, all property acquired during the course of the marriage is presumed to be marital unless it can be shown to have originated in one of the excepted ways outlined in KRS 403.190(2). A party claiming that property acquired during the marriage is other than marital property bears the burden of proof. Essentially, the tracing requirement simply means that "[w]hen the original property claimed to be nonmarital is no longer owned, the nonmarital claimant must trace the previously owned property into a presently owned specific asset." 15 Graham & Keller, *Kentucky Practice, Domestic Relations Law,* § 15.10 at 512 (2nd ed.2000).

■■■ If the claimant does so, then the trial court assigns the specific property, or an interest in the specific property, to the claimant as his or her non-marital property. On the other hand, a claimant cannot meet the tracing requirement simply by showing that he or she brought non-marital property into the marriage without also showing that he or she has spent his or her non-marital assets in a traceable manner during the marriage. Under such circumstances, the trial court will not assign the property to the claimant as non-marital property, but it may consider non-marital contribution as a factor when it makes a just division of the parties' marital property. *See Chenault v. Chenault,* 799 S.W.2d 575, 578–79 (Ky. 1990). *See also Brunson v. Brunson,* 569 S.W.2d 173, 176 (Ky.App.1978); *Angel v. Angel,* 562 S.W.2d 661, 664–65 (Ky.App. 1978).

### a. Standard of Proof for Tracing

■■■ Middleton first argues that the Master Commissioner erred by holding that he had a duty to trace marital contributions into the River Hill Road property. The trial court rejected this objection, stating that Master Commissioner never imposed such a burden on Middleton. Hav-

ing reviewed the record, we agree and find no merit to this argument.

Middleton next argues that the Master Commissioner imposed an unduly high standard of tracing on him. In *Chenault, supra,* the Kentucky Supreme Court recognized that tracing to a mathematical certainty is not always possible, noting that: "[w]hile such precise requirements for nonmarital asset-tracing may be appropriate for skilled business persons who maintain comprehensive records of their financial affairs, such may not be appropriate for persons of lesser business skills or persons who are imprecise in their record-keeping abilities." 799 S.W.2d at 578. As a result, the *Chenault* Court held that testimony alone may be sufficient to satisfy the tracing requirement.

However, in *Terwilliger v. Terwilliger,* 64 S.W.3d 816 (Ky.2002), the Court has held that, while *Chenault* relaxed the more draconian requirements for tracing, it did not do away with the tracing requirements altogether. *Id.* at 821. Where the party claiming the non-marital interest is a skilled business person with extensive record keeping experience, the courts may be justified in requiring documentation to trace non-marital assets into marital property. *Id.*

Middleton contends that the Master Commissioner and the trial court erred by holding him to the higher standard for tracing in *Terwilliger.* Although he has spent most of his career in the financial and securities' industries, Middleton states that his primary duties were managerial in nature and did not require extensive business or financial expertise. As a result, he maintains that it was unreasonable to hold him to such a high standard for tracing his non-marital interests.

We disagree. Middleton clearly maintained detailed records of his financial transactions, including the transactions at

issue here. Moreover, considering the complex series of contribution through which Middleton seeks to trace his non-marital interests, the Master Commissioner reasonably required him to thoroughly document his claims. Under the circumstances, the trial court did not clearly err by imposing a heightened burden of proof on Middleton.

*b. Sufficiency of Middleton's evidence tracing non-marital interests.*

Middleton primarily argues that he traced his non-marital contributions even with the higher standard of proof. He notes that he presented considerable documentation showing his non-marital contributions to the acquisition and renovation of the properties. As a result, Middleton maintains that the Master Commissioner and the trial court erred by finding that he had failed to trace all but $64,800 in non-marital contributions into the River Hill Road property.

As the Master Commissioner recognized, Middleton asserts his claim to a substantial non-marital interest in the River Hill Road property based on a variety of sources. These alleged contributions can be broken down into two distinct categories: (1) the increase in value of the Lightfoot Road and Mockingbird Hill Road properties based on his on his non-marital contributions (2) the increase in value of the River Hill Road property based upon his non-marital contribution. Each of these categories can be further broken down into two sub-categories: (a) the increase value of the residences based upon his initial non-marital contribution; and (b) the increase in value of these residences based upon his subsequent non-marital contributions for renovations and remodeling

i. Tracing of Non–Marital Contributions to previously-owned properties.

 As outlined above, Middleton made substantial non-marital contributions to the acquisition of the Lightfoot Road, Mockingbird Hill Road and River Hill Road properties. However, the Master Commissioner limited Middleton to the value of these contributions. Middleton maintains that the increase in value of these residences is attributable, at least in part, to these contributions. Thus, he contends that the increase should be apportioned between the non-marital and marital interests in accord with the formula set out in *Brandenburg v. Brandenburg*, 617 S.W.2d 871 (Ky.App.1981).

 But in *Travis, supra,* the Kentucky Supreme Court explained that the *Brandenburg* formula is not automatically applicable to situations such as this. Where the property acquired during the marriage includes an increase in the value of an asset containing both marital and non-marital components, the trial court must determine from the evidence why the increase in value occurred. *Id.* at 909. If the increase in value was due to general economic conditions, then the increase is deemed to be non-marital. But if the increase is due to the joint efforts of the parties, then the increase in value is marital. Moreover, KRS 403.190(3) creates a presumption that any such increase in value is marital property. Therefore, a party asserting that he or she should receive appreciation upon a non-marital contribution as non-marital property carries the burden of proving the portion of the increase in value attributable to the non-marital contribution. Otherwise, the increase will be characterized as marital property. *Id.* at 910–11.

The Master Commissioner found that Middleton failed to prove that the increases in value of the Lightfoot Road and Mockingbird Hill Road properties were attributable to his non-marital contributions for the acquisition costs. We find substantial evidence to support this conclusion.

As the Commissioner pointed out, there was no affirmative proof to establish why the Lightfoot Road and Mockingbird Hill Road appreciated in value.

■ With regard to Middleton's claims for non-marital contributions to renovation costs on the Lightfoot Road and Mockingbird Hill Road properties and the increase in value of those properties based on those contributions, we shall adopt the following portion of the Master Commissioner's analysis:

> The *Travis* Court clearly distinguishes between costs expended to acquire an asset and costs that may have been expended to improve an asset. This commissioner does not dispute that the parties in this action expended tremendous sums in the remodeling and renovating of both the Lightfoot Road and Mockingbird Hill Road properties. The holding in *Travis* requires more, however, than just proof of the expenditure of funds from a nonmarital source if the expenditure is for an 'improvement' or for the remodeling the asset as opposed to the acquisition of the asset.

> The *Travis* holding requires that [Middleton] prove the portion of the increase in value of each of these residences attributable to the expenditures for 'improvements' and states that "[b]y virtue of the KRS 403.19(3) presumption, the failure to do so will result in the increase being characterized as marital property." *Travis,* Ky., 59 S.W.3d at 910–11.

> In *Travis,* the trial court had[ ] "made no separate finding of fact that any of the overall appreciation in value resulted from Appellant's non-marital contribution or general economic circumstances ..." *Id.* at 912. In this action, there is no proof before this Commissioner that allows the Commissioner to determine whether the appreciation in value that occurred in these residences was a function of general economic conditions or was the result of the expenditures of nonmarital funds.

> This Commissioner is not unmindful of the extraordinary difficulty that exists in the evidentiary burden of establishing the level of proof that the Commissioner believes is imposed by the statute as interpreted in *Travis,* particularly when the proof weaves a thread through multiple pieces of real property, several of which have not been owned or occupied by the parties for years. It is often impossible to have access to an asset for purposes of analyzing or appraising its condition as that condition may have existed several years in the past. Nevertheless, the case law and statute speak clearly.

> While lawyers bandy about the term 'improvement[s]' in this context in these cases as if the proof is self evident from the expenditure, the real question in any such instances is whether the expenditure of $1 gives you that much bang for your buck in terms of its impact on the value of the asset. Value is an extraordinarily subjective concept and transferring its interpretation years after the fact to a third party not involved in the initial judgment to expend the funds is an arguable disservice to the institution of marriage.

> As Justice Vance stated in his separate opinion in *Turley,*

>> marriage connotes sharing, with the concentration upon what is "ours" rather that what are "his" and what is "hers." It does not bode well for the institution of marriage if each partner must keep in the back of his mind the possible advantage to be obtained by keeping up with and being able to trace every penny brought into the marriage.

*Turley v. Turley,* Ky.App., 562 S.W.2d 665, 669 (1978).

Nonetheless, the case law and the statute speak clearly.

The second part of this improvements analysis concerns the efficacy of [Middleton's] proof in establishing the source of the alleged nonmarital funds expended. Even if the proof had been produced to the Court establishing the value of any expenditures made for 'improvements' and remodeling of these residences, this Commissioner concludes that the tracing as presented by [Middleton] does not accurately account for the commingling of his alleged nonmarital funds with the parties' marital (income) funds.

The problem with the proof as presented by [Middleton] is the hypothetical nature of the evidence on the specific issue to which the increase in value of any of the residences is marital or nonmarital.

In *Kleet v. Kleet,* Ky.App., 264 S.W.3d 610 (2007), the Court of Appeals rejected a tracing model similar in nature to that utilized by [Middleton] to trace his theory about the impact of expenditures on the value of the various residences that the parties [ ]own or have owned. In *Kleet,* the Court stated

> There was also a problem with the method used by the expert witness. Allan's attempted tracing consisted of testimony and reports by another certified public accountant, Ms. Helen Cohen. Ms. Cohen did not attempt to do a traditional tracing of any specific premarital asset into any currently existing asset. She testified that she did not follow the formula set out in *Brandenburg v. Brandenburg,* 617 S.W.2d 871 (Ky.App.1981), at all (she felt it was "inapplicable"). Rather, she used an approximate growth rate, the parties' joint tax returns, depositions of each party, interviews with

> Allan and Allan's statements to produce a "forensic tracing" model. Instead of using the parties' actual living expenses during the marriage, Ms. Cohen testified that she estimated the parties' living expenses based upon Allan's statements and attributed all of Allan's gifts to his family, churches, and his accountant, as coming from marital property. Ms. Cohen asserted, as summarized by the family court, that, "by taking the income during the marriage and subtracting out the [estimated] yearly living expenses during the years of marriage, a percentage of nonmarital to marital assets could be determined." Ms. Cohen then used that calculated percentage to determine the respective marital and nonmarital interests in stocks purchased during the marriage. While Allan has cited us to several cases from other jurisdictions which discuss, with some degree of approval, "forensic tracing," we know of no authority accepting as satisfactory so amorphous a method of "tracing" as that presented in this case.

*Kleet,* Ky.App., 264 S.W.3d at 615.

In *Brunson v. Brunson,* Ky.App., 569 S.W.2d 173 (1978), the Court of Appeals rejected Mr. Brunson's attempt to trace his nonmarital estate by comparing his net worth at the date of the marriage with his net worth at date of divorce. Again, the Court rejected the hypothetical nature of the proof.

Without question, [Middleton's] presentation of proof in this action is far more detailed and exacting in its presentation that was offered in either the *Kleet* or *Brunson* matters. As presented, however, it does not completely distinguish the nonmarital nature of each expenditure from its marital nature by virtue of the comingling of funds. This Commissioner has exhaustively combed

through hundreds of pages of banking and other financial account records introduced into evidence. This Commissioner is prepared, if necessary[,] to make separate findings on the portions of any and all expenditures made for purported 'improvements' or renovations if the issues is remanded for that purposes. For the sake of time and the parties' resources, the Commissioner will not include in this Report any such findings. They are not necessary because of the Commissioner's prior conclusion that the proof of mere expenditures does not meet the evidentiary burden required by [ ] KRS 403.190(3) and the holding in *Travis*.

ii. Tracing of Non–Marital contributions in River Hill Road property.

Middleton's claims for a proportionate non-marital share of the increase in value of River Hill Road property is subject to much of the same analysis as the other properties. The parties agree that Middleton is entitled to at least a $64,800 credit for his non-marital contribution to the acquisition of the River Hill Road property. Furthermore, Middleton presented exceptionally detailed proof concerning his contributions of non-marital property to the renovation of the River Hill property. It seems likely that those expenditures added value to the property. But as the Master Commissioner noted, it is very difficult to trace expenditures for specific improvements into the overall value of the property. Such tracing is made more difficult by the collapse of the real estate market in 2007–2008, which depressed the value of the property.

Moreover, Middleton's non-marital contributions were significantly intermingled with marital contributions. Middleton spent marital income to pay for the mortgage and some renovation expenses. In addition, Maclean testified that she served as general contractor on the renovation

project. This work saved the parties a great deal of money and constitutes a significant marital contribution on her part. Under the circumstances, the trial court did not clearly err by declining to award Middleton a share of the increase in value of the River Hill Road property in proportion to his non-marital contributions.

*c. Valuation of River Hill Road*

■ In her direct appeal, Maclean argues that the Master Commissioner and the trial court erred by valuing the River Hill Road property based upon its sale price in 2009. She states that Middleton's unreasonable demands delayed the sale, resulting in the depressed sale price. Maclean asserts that the trial court should have imputed a higher sale price to the property and charged the reduction against Middleton's marital share of the proceeds.

At the time of separation in 2006, the parties listed the River Hill Road property for sale for $1,745,000. In February of 2007, the parties' realtor recommended that the sale price be reduced to between $1,645,000 and $1,690,000. After some negotiation, Middleton agreed to reduce the list price to the higher amount. No offers were forthcoming at that price. In late 2007 and 2008, the real estate market collapsed. In May 2009, the parties received an offer of $1,175,000, which was ultimately accepted.

In its order confirming the Master Commissioner's report, the trial court agreed with Maclean that Middleton intentionally inflated the initial listing price and obstructed the sale the initial listing price demanded by Middleton to improve his bargaining position. However, the court noted that there were no offers on the River Hill Road property other than the final offer of $1,175,000. In the absence of any higher valuation or appraisal of the property, the trial court determined that

the final offer was the only evidence on which it could value the property. As this finding was supported by substantial evidence of record, we will not disturb it.

### C. *Distribution of marital personalty*

■ On July 7, 2009, the trial court entered an order directing the parties to meet at the River Hill Road property and conduct an inventory of all marital and non-marital property located there. The order stated that Maclean "shall be entitled to identify and remove forthwith all of her remaining non-marital property", as well as any other marital property at issue. Maclean states that Middleton refused to allow her to inspect the house and grounds when she arrived at the appointed time. In addition, she alleges that Middleton had already loaded numerous items of furniture and personal effects into two portable storage units which were parked in the driveway.

Maclean argues that this matter should be remanded for additional proceedings. She asserts that the trial court should first enter orders directing Middleton to comply with its July 7, 2009 orders, and thereafter, to make specific findings dividing the personal property from the residence.

■ The trial court "has wide discretion in dividing marital property; and we may not disturb the trial court's rulings on property-division issues unless the trial court has abused its discretion." *Smith,* 235 S.W.3d at 6. The test for abuse of discretion is whether the trial court's decision was "arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English,* 993 S.W.2d 941, 945 (Ky.1999) (*citations omitted*). The trial court conducted an extensive hearing on Maclean's motion, hearing testimony and receiving evidence from both parties. In its final order, the trial court addressed this issue as follows:

> In many respects the issue of the division of the parties' furniture, furnish-ings, appliances, household goods, and personal items is indicative of the parties' conduct during these proceedings. They have placed into evidence demonstratives exhibits purporting to be lists of various items of furniture, furnishings, appliances, household goods, and personal items belonging to the parties. . . . Evidence in the record indicates that Ms. Maclean has picked-up several items from the former marital residence and other exhibits from Mr. Middleton represents to the Court that Ms. Maclean has also taken into her possession several other items of furniture. Yet the parties are unable to agree on items that have actually been taken into the possession of the other party. Therefore, the Court will award each party all of the furniture, furnishings, appliances, household goods and personal items currently in their possession

In essence, the trial court found that Maclean had already received a number of items of marital and non-marital personalty from the residence, and she had failed to establish that Middleton was wrongfully retaining any additional property. It is beyond the scope of this Court's review to consider the sufficiency of this finding with regard to specific items of personalty. Given the contentious nature of the litigation and the lack of definitive proof on both sides, the trial court's ultimate decision on this issue was not an abuse of its discretion.

### D. *Division of Debt*

■ Both parties challenge the trial court's assignment of unsecured debt. There is no dispute concerning the total amount of marital debt. At the time of the entry of the final decree, the parties had nine outstanding personal debts. Four of the accounts were in Middleton's name, with unpaid balances totaling $56,575. Five of the accounts were in

Maclean's name, with unpaid balances totaling $84,297. The trial court assigned each party the debt in his or her own name. In her direct appeal, Maclean contends that this division is unfair considering the significant disparity between the parties' incomes. In his cross-appeal, Middleton argues that the trial court improperly assigned one of the debts to him without any credit for payments which he made while the matter was pending.

As with division of marital property, the trial court's decisions regarding division of marital debt is reviewed for abuse of discretion. *Neidlinger v. Neidlinger*, 52 S.W.3d 513, 523 (Ky.2001). Furthermore, there is no presumption that debts incurred during the marriage are marital. Rather, the party claiming that a debt is marital has the burden of proof. *Id.* In making this determination, the trial court should consider receipt of benefits, the extent of participation, whether the debt was incurred to purchase assets designated as marital property, whether the debt was necessary to provide for the maintenance and support of the family, and any economic circumstances bearing on the parties' respective abilities to assume the indebtedness. *Id.*

The trial court noted that nearly all of the unsecured debt was incurred after the parties separated. The court also noted that Maclean incurred personal debt while she was receiving substantial amounts of maintenance and child support from Middleton. The trial court implicitly concluded that Maclean incurred the majority of her debt for her own benefit beyond her reasonable needs. We cannot find that the trial court misapplied the relevant factors of *Neidlinger* or that it abused its discretion by assigning this debt to Maclean.

Middleton also objects to the trial court's allocation of one of the unsecured debts to him. The largest unsecured debt assigned to him was a line of credit from Commonwealth Bank & Trust with a balance of $51,637. Middleton alleges that he incurred most of this debt on expenses for Maclean's support and for her attorney fees. Consequently, he argues that this debt should have been allocated between the parties rather than assigned entirely to him.

We likewise find no error or abuse of discretion on this issue. The trial court did not expressly address whether the debt was marital or non-marital. But even assuming that debt was entirely marital, the trial court has broad discretion under *Neidlinger* in allocating such debt. Considering the large amount of debt already assigned to Maclean, the trial court did not abuse its discretion by assigning the remaining debt to Middleton.

E. *Reimbursement of Medical Expenses and Health Insurance Premiums*

The last issue in Maclean's direct appeal concerns her claim for reimbursement of medical expenses and health insurance premiums. She alleges that the trial court's *pendente lite* order entered on October 1, 2007, requires Middleton to reimburse Maclean for all medical expenses incurred by her for the and the parties children and to maintain health insurance for her and the children at a level commensurate with that enjoyed during the marriage. A plain reading of that order shows otherwise.

The trial court ordered Middleton to provide health insurance only for the parties' two minor children. The court further directed that the costs of such insurance be allocated between the parties according to their contribution to the combined total monthly income: 25% to Maclean and 75% to Middleton. Likewise, the court directed Middleton to pay for the children's uncovered medical expenses in the same proportion. In its final order, the trial court pointed out

the terms of its prior order and also noted that Maclean had failed to substantiate her claim of any additional amounts owed. This conclusion was supported by the record and will not be disturbed.

## V. Cross-appeal Issues

### A. *Award of Maintenance to Maclean*

■ We now turn to the issues relating exclusively to Middleton's cross-appeal. Middleton first objects to the trial court's award of $2,500 per month in maintenance to Maclean for a period of twelve months following entry of the judgment. He notes that the parties were only married for seven years. In addition, Maclean received substantial maintenance during the four years while this action was pending. From 2006 until October of 2007, Middleton paid Maclean support totaling $8,500 per month. Thereafter, she received temporary maintenance of $5,000 per month.

Middleton also points out that Maclean received a substantial award of marital property. Finally, Middleton notes that the trial court found Maclean is capable of working and earning at least $2,100 per month. Given these resources, Middleton argues that Maclean was not entitled to any additional maintenance after entry of the final judgment and decree.

An award of maintenance is within the sound discretion of the court and will not be disturbed on appeal absent an abuse of discretion. *Gentry v. Gentry*, 798 S.W.2d 928 (Ky.1990); *Perrine v. Christine*, 833 S.W.2d 825 (Ky.1992). As an initial matter, KRS 403.200(1) provides for maintenance only if the court finds that the spouse seeking maintenance:

(a) Lacks sufficient property, including marital property apportioned to him, to provide for his reasonable needs; and
(b) Is unable to support himself through appropriate employment or is the custodian of a child whose condition or circumstances make it appropriate that the custodian not be required to seek employment outside the home.

In this case, the trial court made specific findings on both of these points. The trial court recognized that Maclean came to the marriage in 1999 with little or no assets, but will leave the marriage with a substantial award of marital property. The court also noted that she received substantial support from Middleton during the pendency of this action.

The court also addressed Maclean's ability to support herself through appropriate employment. She had not been employed outside the home between the time the parties married and when they separated in 2006. Since the separation, Maclean had been involved in several businesses, none of which have provided more than $1,462.50 per month. She was also working on obtaining her real estate license. The trial court noted that Maclean is relatively young, healthy, well-educated, "and has work experience that given time, she can develop into self employment that can provide her with income sufficient to support herself and assist in the support of the parties two (2) minor children."

On the other hand, the trial court pointed out that the parties enjoyed a high standard of living during the marriage and Middleton will continue to enjoy that standard after the marriage. "However, it is not reasonable to expect that after the divorce Mr. Middleton would be required to provide Ms. Maclean with a lifestyle for the rest of her life that she enjoyed during their short seven (7) year marriage." Based on these factors, the trial court found that, "at the present time," Maclean lacked sufficient financial resource to provide for her reasonable needs as is presently unable to support herself through appropriate employment. These findings were supported by substantial evidence and will not be disturbed.

As an appellate court, this Court is not authorized to substitute its own judgment for that of the trial court on the weight of the evidence where the trial court's decision is supported by substantial evidence. *Leveridge v. Leveridge*, 997 S.W.2d 1, 2 (Ky.1999). Furthermore, once the trial court finds that maintenance is appropriate, the amount and duration of maintenance is left to the sound discretion of the trial court based on the factors set out in KRS 402.200(2)(a)–(f). *Gentry*, 798 S.W.2d at 937; *Combs v. Combs*, 622 S.W.2d 679, 680 (Ky.App.1981), *citing* KRS 403.200(2); *Browning v. Browning*, 551 S.W.2d 823 (Ky.App.1977); and *Russell v. Russell*, 878 S.W.2d 24, 26 (Ky.App.1994). Given the trial court's findings, we find no abuse of discretion in the amount or duration of its award of maintenance to Maclean.

B. *Calculation of child support*

Along similar lines, Middleton contends that the trial court erred in its calculation of Maclean's income for purposes of child support. As previously noted, the trial court imputed an income of $2,100 per month to Maclean. Middleton states that there was evidence showing that Maclean would have been able to earn at least $40,000–$45,000 per year, or between $3,333 and $3,750 per month. Consequently, he maintains that the trial court should have imputed a higher income to Maclean.

KRS 403.212(2)(d) allows a court to base child support on a parent's potential income if it determines that the parent is voluntarily unemployed or underemployed. A trial "court may find a parent to be voluntarily unemployed or underemployed without finding that the parent intended to avoid or reduce the child support obligation." KRS 403.212(2)(d). The statute further specifies that "[p]otential income shall be determined based upon employment potential and probable earnings level based on the obligor's or obligee's recent work history, occupational qualifications, and prevailing job opportunities and earnings levels in the community." The court may consider the totality of the circumstances in determining whether a parent is voluntarily unemployed or underemployed. *Polley v. Allen*, 132 S.W.3d 223, 226–27 (Ky.App.2004).

Nevertheless, the trial court's determination of Maclean's earning capacity involves a finding of fact, which will not be disturbed unless clearly erroneous. CR 52.01. Due regard shall be given to the opportunity of the trial court to evaluate the weight of the evidence and the credibility of witnesses. *Id.* The trial court was responsible for deciding that question of fact based on the parties' testimony and other evidence. *See also Moore v. Asente*, 110 S.W.3d 336, 354 (Ky.2003). While there was contrary evidence in the record, the trial court's findings regarding Maclean's earning capacity was supported by substantial evidence.

In the alternative, Middleton argues that the trial court should have deviated from the Child Support Guidelines considering the parties nearly equal parenting time with the children. The period of time during which the children reside with each parent may be considered in determining child support, and a relatively equal division of physical custody may constitute valid grounds for deviating from the guidelines. *Plattner v. Plattner*, 228 S.W.3d 577 (Ky.App.2007). *See also Downey v. Rogers*, 847 S.W.2d 63, 65 (Ky.App. 1993). Given the shared-custody arrangement in this case, the trial court would have been within its discretion to deviate from the guidelines. But contrary to Middleton's argument, the trial court was not required to do so. *Downey*, 847 S.W.2d at 64–65. *See also McFelia v. McFelia*, 406

S.W.3d 838, 839–41 (Ky.2013). Thus, we find no abuse of discretion.

C. *Award of Attorney Fees and Costs*

■ Finally, Middleton objects to the trial court's award of attorney fees and costs to Maclean. While the matter was pending, Middleton advanced a total of $175,000 toward Maclean's attorney fees and costs. By the time of the entry of the final order, Maclean claimed a total of $410,503 in attorney fees and costs. The trial court found that both parties had engaged in tactics which inflated the legal fees. But after considering the disparate financial resources, the court concluded that Maclean was entitled to one half of her claimed expenses, or $205,251. Consequently, the trial court ordered Middleton to pay an additional $30,251 in attorney fees and costs to Maclean.

Middleton argues that the total fees and costs awarded to Maclean were not reasonable considering her conduct during the litigation. KRS 403.220 authorizes a trial court to order one party to a divorce action to pay a "reasonable amount" for the attorney fees of the other party, but only if there exists a disparity in the relative financial resources of the parties in favor of the payor. But even if a disparity exists, the trial court retains broad discretion under KRS 403.220 to determine the appropriate amount of attorney fees. *Neidlinger,* 52 S.W.3d at 519; *see also Gentry,* 798 S.W.2d at 938.

Middleton concedes that there is a substantial disparity between his resources as Maclean's. The trial court recognized this disparity, and also declined to characterize the fees and costs incurred in this matter as unreasonable. But under the circumstances, the court also concluded that it would be unreasonable to "place the financial burden for these astronomical fees at the feet of one party, Mr. Middleton. It is the Court's opinion that each party must be financially vested in this litigation and suffer the financial consequences of their [*sic*] decisions." Apart from a cursory argument, Middleton does not demonstrate how the trial court's award of attorney fees and costs to Maclean amounted to an abuse of its discretion. Therefore, we decline to consider the issue further.

**VI. Conclusion**

In conclusion, this action presented a number of complex and contentious issues. The dissent challenges the trial court's use of an appointed Master Commissioner in this case and there may be valid grounds to question the use of this procedure in the future. However that issue is not presented in this appeal and should not be taken as a direct criticism of the conduct of the Master Commissioner in this case. To the contrary, we compliment the Master Commissioner's thorough handling of these issues and the trial court's deft handling of the entire matter throughout the protracted litigation. The extensive findings and conclusions by the Master Commissioner and the trial court have greatly assisted this Court in our consideration of the issues on appeal.

The two most factually complex issues concern the characterization of the Trust distributions and the tracing of Middleton's non-marital interest in the River Hill Road property. But while the underlying Trust issue is difficult to follow, the issue presented in this case is not. The only issue concerns the source of funds which were used to pay the settlement distributions to Middleton. Under any analysis, the source of those funds was the non-marital Daughters' Trust. Therefore, the trial court did not clearly err in finding those distributions to be Middleton's non-marital property.

On the other hand, the tracing issue is both factually and legally complicated. As the Master Commissioner recognized, Middleton presented impressively detailed evidence showing his non-marital contribu-

tions to the various residences. However, those contributions were substantially intermingled with marital contributions. Consequently, it is difficult to trace Middleton's contributions into the increase in value of those properties. The holdings of *Terwilliger* and *Travis* holding place that burden on Middleton. We cannot find that the Master Commissioner or the trial court clearly erred in finding that Middleton did not meet that burden.

The remaining issues in Maclean's appeal and Middleton's cross-appeal involve the sufficiency of the evidence supporting the trial court's findings and matters which are within the discretion of the trial court. There was substantial evidence to support the trial court's findings. In the absence of a showing of abuse of discretion, we cannot disturb the trial court's determinations in these matters.

Accordingly, the judgment of the Jefferson Family Court is affirmed.

STUMBO, Judge, Concurs.

TAYLOR, Judge, Concurs in Part, Dissents in Part, and Files Separate Opinion.

TAYLOR, Judge, Concurring In Part And Dissenting In Part.

Respectfully, I concur in part and dissent in part. I concur with the majority opinion on those issues raised on appeal which were heard by the Family Court Judge and not delegated to the Master Commissioner. However, I must respectfully dissent to the majority's decision on all issues raised on appeal that look to the recommendation of the Master Commissioner to the Family Court Judge—specifically the determination of appellee's nonmarital interest in various assets, including the distributions from "the Daughter's Trust" and the nonmarital interest in the marital residence in conjunction with other real property bought and sold by the parties during the marriage.

By order entered by the Family Court Judge on July 16, 2007, pursuant to an agreement between the parties and their attorneys (as recited therein), a Master Commissioner was appointed by the family court to hear and issue a proposed ruling on all nonmarital property claims of the parties, including appellee's nonmarital claim to the Daughter's Trust and the marital residence. This was an unconstitutional delegation of the family court's authority and duties, in my opinion.

On February 3, 2009, the Master Commissioner filed a twenty-six page report with the family court setting forth various findings of fact and proposed disposition of the disputed issues regarding the nonmarital claims. In the family court's findings of fact, conclusions of law and judgment/order entered by the family court on November 8, 2010, the Family Court Judge incorporated and adopted the Master Commissioner's report therein as concerns the disputed issues involving the nonmarital property claims. In so doing, the Family Court Judge improperly ruled on nonmarital property issues that he had not heard.

The family court's improper delegation of its constitutional duties to the Master Commissioner and subsequent reliance thereon of proposed findings and conclusions as set out in the Master Commissioner's report is an error of law for which I would reverse the family court in its entirety regarding the same. This error need not be preserved below or sufficiently raised by the parties on appeal as it is palpable, substantial and otherwise a manifest injustice to the parties in this case. CR 61.02.[1] This legal error further frus-

---

1. I would also note that any subject matter jurisdictional issue can be raised by the Court, *sua sponte*, at any time during the proceedings and the parties may not confer

trates the purpose, intent, and integrity of family courts in Kentucky as approved by the citizens of Kentucky in passage of the 2002 constitutional amendment creating the family court system.

Additionally, the majority has incorporated and adopted the analysis of the Master Commissioner as authority in this Court's Opinion, which is also an error of law, in my opinion. Effectively, the majority has held that upon agreement of the parties and their attorneys, a Family Court Judge in Kentucky may legally violate his constitutional duties through an unlawful delegation of his authority. Not surprisingly, I can find no legal precedent for this type of conduct, because none exists until now. The majority concludes that it is "within the discretion" of the family court to appoint a Master Commissioner to assist in the performance of its duties in a divorce case. If this is in fact the law in Kentucky then the Family Court Judges in the other seventy counties in Kentucky who faithfully perform their duties on a daily basis, need to be immediately apprised that they can delegate their duties to non-judicial persons.

For the reasons that follow, I believe the order improperly delegating the duties of the Family Court Judge to the Master Commissioner was a nullity and otherwise of no force or effect, thereby creating no legal validity in the Master Commissioner's recommendation to the family court.

## I. FAMILY COURTS IN KENTUCKY

Family courts in Kentucky were created in 1991 as a pilot program in Jefferson County. The court, a division of the circuit court, was designed to focus solely on the needs of families and children by allowing one judge to hear all of the families' legal problems and issues. Subsequently, under the guidance of then Chief Justice

Joseph Lambert, the pilot project expanded across Kentucky. In November 2002, the family court became a permanent part of the Kentucky Constitution upon passage of a constitutional amendment that was approved by voters in all of Kentucky's 120 counties. Today, family courts operate in 71 of Kentucky's 120 counties. The Court of Justice website gives the following discussion of the scope, function and jurisdiction of family courts in Kentucky today:

**One Family, One Judge, One Court**

Family Court is involved in the most intimate and complex aspects of human nature and social relations. For that reason, Family Court uses a case management process that distinguishes it from other trial courts. With the One Family, One Judge, One Court approach, cases are presented in a single court, allowing the same judge to hear all matters involving a particular family. This reduces the stress that can arise when individuals are shuttled between courts to resolve a variety of issues.

**Focusing on the Needs of Families**

Because Family Court gives cases involving families and children the highest priority, these cases do not compete with criminal and other civil cases for judicial time. As a division of Circuit Court, which is the highest trial court in Kentucky, Family Court employs full-time judges with the same qualifications as those who serve the other divisions of Circuit Court.

In addition to the family matters heard in Circuit Court, Family Court judges also handle family law matters that were traditionally decided in District Court. Family Court jurisdiction is defined by KRS 23A.100 and 23A.110 and includes the following:

● Dissolution of marriage

---

jurisdiction by consent. *Stewart v. City of Corbin,* 294 Ky. 284, 171 S.W.2d 445 (1943);

*Stanley v. C & R Asphalt, LLC,* 396 S.W.3d 924 (Ky.App.2013).

- Spousal support and equitable
- Distribution
- Child custody, support and visitation
- Paternity, adoption
- Domestic violence
- Dependency, neglect and abuse
- Termination of parental rights
- Runaways, truancy, beyond control
 @courts.kygov/courts/familycourt/pages/
 default.aspx

## II. DELEGATION OF JUDICIAL AUTHORITY AND DUTIES BY THE FAMILY COURT TO A MASTER COMMISSIONER IS PROHIBITED

As noted, the family courts were officially made a part of the Kentucky Judicial System by constitutional amendment in November 2002. Kentucky Constitution, Section 112(6). In 2003, the jurisdiction of the family court was set out by the General Assembly in KRS 23A.100. Specifically, KRS 23A.100(1) states as follows:

(1) As a division of Circuit Court with general jurisdiction pursuant to Section 112(6) of the Constitution of Kentucky, a family court division of Circuit Court shall retain jurisdiction in the following cases:

(a) Dissolution of marriage;

(b) Child custody;

(c) Visitation;

(d) Maintenance and support;

(e) Equitable distribution of property in dissolution cases;

(f) Adoption; and

(g) Termination of parental rights.

Equally relevant to the passage of this legislation which established the jurisdiction of the family court was the passage of KRS 23A.120, which abolished domestic relations commissioners in those counties where family courts were established or existed. Prior to the passage of this statute, a domestic relations commissioner could be appointed by the chief circuit judge in each county. Formerly CR 53.03; effective January 1, 2011, Rule 4 of the Family Court Rules of Practice and Procedure (FCRPP) is controlling. The role of the domestic relations commissioner was to hear proof in domestic cases and make recommendations to the circuit judge. The judge was duty bound to review the report of the commissioner, consider objections, if any from the parties and issue findings of fact and conclusions of law. See FCRPP 4 and former CR 53.03, 53.04, 53.05 and 53.06. In those counties where family courts have not been established, domestic relations commissioners may still be utilized today by circuit courts. FCRPP 4. In Jefferson County, domestic relations commissioners have been abolished in their entirety since January 1, 2003. KRS 23A.120.

Thus, there is no constitutional, statutory, or procedural authority that permits a family court judge in Kentucky to appoint a Master Commissioner to perform his duties.[2] In this case, the Jefferson Family Court has improperly delegated its constitutional duties, including its decision making authority to a Master Commissioner in contravention of Section 109 of the Kentucky Constitution, in direct circumvention of KRS 23A.120 and KRS 31A.020(1), and in direct violation of applicable civil rules relating to Master Commissioners.[3]

---

**2.** In *Campbell v. Campbell,* Case No. 2006–CA–001803–MR and 2006–CA–001827–MR (2010), this Court has previously prohibited the family court in Jefferson County from delegating their constitutional duties to arbitrators in domestic relations proceedings. That prohibition remains in effect today.

**3.** The duly appointed Master Commissioner in Jefferson County is Edith Halblieb, who also refers to herself as the Jefferson Circuit Court Commissioner. KRS 31A.010(1). There is no statutory authority in Kentucky for a family court judge to appoint a Master Commissioner.

In Kentucky, each court is vested with constitutional decision making responsibility in every case within its jurisdiction. *Bingham v. Bingham,* 628 S.W.2d 628 (Ky. 1982); 15 Louise E. Graham & James E. Keller, *Kentucky Practice—Domestic Relations Law* § 13.4 (2008). This decision-making responsibility also finds expression in CR 52.01. In *Bingham,* the Kentucky Supreme Court upheld the delegation to attorneys of the clerical task of drafting proposed findings of fact and conclusions of law. However, the Supreme Court did not condone the delegation of a court's actual power or duty to make findings of fact and to draw conclusions therefrom. *Bingham,* 628 S.W.2d 628. The Supreme Court noted that the distinguishing factor in determining whether an improper delegation of the court's powers had occurred was whether there was a "showing that the decision-making process was not under the control of the trial judge" or whether "these findings and conclusions were not the product of the deliberations of the trial judge's mind." *Id.* at 629–630. In this case, the order appointing the Master Commissioner clearly and succinctly states the family court judge has appointed the Master Commissioner to hear proof and issue findings of fact and conclusions of law. This delegation of decision-making authority is simply improper, in my opinion, and renders any order that relies on the Master Commissioner recommendation by the family court void on its face. A judge simply may not delegate his or her judicial authority to non-judicial persons in Kentucky. *Rose v. Council for Better Educ., Inc.,* 790 S.W.2d 186 (Ky.1989).

Accordingly, I believe the family court's mechanical adoption of a recommendation containing findings of fact and conclusions of law made by an unauthorized, non-judicial Master Commissioner violates the court's constitutional decision-making authority and CR 52.01. *See Ky. Const., § 109; Bingham,* 628 S.W.2d 628; *Rose,*

790 S.W.2d at 215. The fact that the parties and their attorneys may consent or acquiesce in this unlawful delegation of authority and duties does not make it lawful or proper, and is otherwise immaterial.

Since domestic relations commissioners in counties establishing family courts have been abolished, there is no authority that allows family court judges to delegate cases to a Master Commissioner to hear proof that by law can only be heard by the Family Court Judge. In fact, there exists no legal authority for a Family Court Judge to appoint a Master Commissioner in Kentucky. CR 53.01 clearly states that "other Master Commissioners, deputy Master Commissioners, receivers and their assistants may be appointed only upon express authority of the Chief Justice." No such appointment was obtained from the Chief Justice in this case, which I find very disturbing. Essentially, a special commissioner was appointed by a Family Court Judge without legal authority to do the same.

However, the majority condones the appointment of the Master Commissioner under the family court's discretionary authority arising from Kentucky Rule of Evidence (KRE) 706(a) and the court's ability to appoint experts who may assist the family court in its fact-finding duties. I strongly disagree with this position and submit that KRE 706(a) does not permit a Family Court Judge to appoint an "expert" to assist in the performance of his or her judicial duties nor is there any legal authority in Kentucky that supports this position. The order entered by the family court in this case on July 16, 2007, plainly states that "[b]y agreement of the parties and their counsel, . . . is appointed as Master Commissioner for this Court to hear the proof and issue his Findings of Fact,

Conclusions of Law and Proposed Decision on the issue of Respondent's non-marital claims herein." In my review of Kentucky Jurisprudence, I can find no legal authority or legal precedent that permits the appointment of an expert by a judge to hear proof and render findings of fact and conclusions of law. Frankly, a judge who follows this path would likely be in violation of Canon 3(B) of the Kentucky Code of Judicial Conduct (Supreme Court Rule 4.300) that requires all judges in Kentucky to hear and decide those cases assigned to the judge. The delegation of a case by a judge to an "expert" to hear proof and render a proposed decision clearly violates a judge's judicial duties under the Canons, in my opinion.

Even more disturbing was the unlimited cap for compensation paid to the appointed commissioner, which in this case exceeded $52,000—more than the $48,000 *annual* limit set out in CR 53.07 (and the former CR 53.08) for Master Commissioners or domestic relations commissioners who are duly authorized by the circuit court.[4] Even if a special commissioner were permitted for a family court, the excess compensation would have to be approved by the Chief Justice, which again, did not occur in this case. However, defiance of the Constitution, applicable statutes, and civil rules applicable to family courts were not the only unlawful actions taken in this case. The Jefferson Family Court's local rules were also violated as discussed below.

### III. LOCAL RULES OF THE JEFFERSON FAMILY COURT (JFRP)

I submit that the appointment of a Master Commissioner in this case also violated the local rules of the Jefferson Family Court (JFRP) in effect at the time of the appointment in July of 2007. The authorization to enact local rules is set forth in Supreme Court Rule (SCR) 1.040(3)(a). Local rules must be approved by the Kentucky Supreme Court. Jefferson County has perhaps, the most comprehensive and extensive local rules governing family court practice of any county in Kentucky that has established family courts. The Kentucky Supreme Court in *Abernathy v. Nicholson*, 899 S.W.2d 85 (Ky.1995), made the following observation regarding local rules:

> The authorization to enact local rules pursuant to SCR 1.040(3)(a) is subject to two conditions: first, that no local rule shall contradict any substantive rule of law or any rule of practice and procedure promulgated by this Court, and second, that it shall be effective only upon Supreme Court approval.

*Id.* at 87.

My discussion of the JFRP is pertinent for two reasons. First, in 2007 there existed no provisions in the JFRP, as approved by the Kentucky Supreme Court, that permitted the assignment of domestic relations cases to a master commissioner.[5] In fact, no such authority exists today. Second, the delegation of judicial duties to a

---

4. The Master Commissioner testified before the family court on March 24, 2010, that his fee as mediator had totaled $9,882 and his fee as Master Commissioner totaled $51,937.50. He also testified that additional fees would be charged for attending the hearing and giving testimony regarding his fees. A family court judge in Kentucky is paid $124,618 annually. It is also worthy of note that the court's judgment entered November 19, 2010, re-

flects that the parties' attorneys as of that date had been paid over $817,000 in legal fees, prior to this appeal.

5. The JFRP was amended June 22, 2011, in response to the Supreme Court implementation of the FCRPP effective January 1, 2011. Reference is made to the former JFRP rules in effect at the time of appointment of the Master Commissioner in 2007.

Master Commissioner is actually in direct violation of the JFRP that was in effect in 2007.

The former JFRP 711 provided that if a settlement could not be reached through mediation, a trial shall be conducted. Mediation did occur in this case without success. In fact, the mediator in this case was the same attorney later appointed as Master Commissioner, which is also most troublesome to me. Regardless, the former JFRP 702 specifically stated that "[t]rials in chief of all domestic relations cases ... shall be heard by a judge." This case is clearly a contested, domestic relations case pertaining to property division which was not heard in chief by a family court judge as required by the former JFRP 702. Additionally, it should be noted that the FCRPP adopted by the Kentucky Supreme Court on November 3, 2010, and effective January 1, 2011, makes no reference to family court judges being permitted to delegate duties to a Master Commissioner. FCRPP 4 specifically addresses domestic relations commissioners only for those jurisdictions having no family court. Domestic relations commissioners in counties having no family court can only receive a fee of $60 per hour, in contrast to the Master Commissioner's hourly rate of $250 per hour in this case. And, FCRPP 3 clearly requires the Family Court Judge to try all contested issues.

Accordingly, for the reasons stated, I believe any ruling on those matters regarding the division of property not heard by the judge to be null and void since the jurisdiction of the family court has been compromised through the unlawful delegation of the court's authority and duties.

Finally, I would be remiss if I did not address one other matter that is most troublesome in this case. By order entered November 15, 2006, in the early stage of this case, the family court entered an "Order of Confidentiality," presumably at the request of the parties. The effect of this order was to completely seal the record in this case. Since July 2006, through the filing of the appeal on June 16, 2011, there have been 251 docketed entries in the circuit court clerk's record below, all having the notation "SEALED DOCUMENT." In my review of the record in this case, I have found no documentation or information worthy of being sealed from the public's view. This case is simply a dissolution of an affluent couple's marriage, which has no indication of domestic violence, child abuse or juvenile issues, trade secrets, confidential business records or any other matter that could warrant being sealed from the public's view. The order sealing the record in this case does not state what, if any, grounds justify sealing the entire record.

The lack of transparency in our courts can undermine an effective judicial system, in my opinion. At first blush, the only basis for which this record has been sealed in this case looks to the affluence of the parties rather than the merits of protecting privileged or confidential information. In my opinion, unless court records are required to be sealed by statutory mandate, evidentiary or procedure rules, or other Supreme Court rules, the public's right to open and transparent courts supersedes an individual's personal desire to avoid disclosure and possible embarrassment, especially where a sealed record is solely based on one's economic status, as it appears in this case.

In 2010, the Chief Justice of Kentucky directed all judges in Kentucky to seal cases "only for compelling reasons." I find no compelling reason for any of the pleadings or records in this case to be sealed from public view. If this case has been legitimately sealed, then the Supreme Court should order every divorce court file

in Kentucky to be sealed in the future, in all 120 counties.

In summation, I would reverse and remand this case to the Jefferson Family Court for trial of all disputed issues or claims regarding appellee's nonmarital interest in the various property as determined by the Master Commissioner and adopted by the family court. An order should also be entered unsealing the record in this case.