AMERICAN PHYSICIANS ASSURANCE CORPORATION, Successor to Kentucky Medical Insurance Corporation, Appellant,

v.

Steven SCHMIDT; Steven L. Schmidt, Administrator of the Estate of Terry Ann Schmidt, Deceased; Steven Schmidt, Assignee of J. Boswell Tabler, M.D.; and Tabler & Associates, n/k/a Tabler Clinical Services, Appellees.

No. 2004–SC–0171–DG.

Supreme Court of Kentucky.

March 23, 2006.

5. 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

6. 92 S.W.3d 76 (Ky.2002).

Mark G. Arnzen, Beverly R. Storm, Arnzen, Wentz, Molloy, Laber & Storm, PSC, Covington, Counsel for Appellant.

Bixler W. Howland, Bixler W. Howland, PSC, Louisville, Counsel for Appellees.

Opinion of the Court by Justice COOPER.

On July 8, 1991, Dr. J. Boswell Tabler, M.D., a psychiatrist, began treating Terry Ann Schmidt, wife of Appellee, Steven L. Schmidt, for a mental illness. Dr. Tabler prescribed two psychotropic medications, Lithium and Stelazine, as part of the treatment. Mrs. Schmidt had a history of blood abnormalities and subsequently developed aplastic anemia, a blood disease that is often fatal. She died on June 30, 1993. Steven Schmidt, individually and as

administrator of his deceased wife's estate, brought a medical malpractice action against Dr. Tabler, alleging that ingestion of Lithium and/or Stelazine caused Mrs. Schmidt to develop aplastic anemia which resulted in her death. Dr. Tabler was covered by a medical malpractice liability insurance policy issued by Kentucky Medical Insurance Corporation ("KMIC"), the predecessor corporation of Appellant, American Physicians Assurance Corporation. Dr. Tabler's KMIC policy had liability limits of one million dollars per occurrence. At the conclusion of a Jefferson Circuit Court jury trial held in October 1995, the jury returned a verdict in favor of Schmidt in the sum of $1,807,295.36, *i.e.*, $807,295.36 more than the liability coverage limits of Tabler's KMIC policy. It is undisputed that Schmidt offered to settle his claim for one million dollars prior to trial and that KMIC neither accepted this offer nor made a counteroffer. Like many professional liability insurance policies, Tabler's KMIC policy contained a "consent to settle" clause providing that: "The Company shall not compromise any claim hereunder without the consent of the named Insured." KMIC maintains that it did not enter into negotiations with Schmidt because Dr. Tabler did not consent to a settlement of Schmidt's claims against him.

After judgment was entered pursuant to the verdict, Dr. Tabler retained personal counsel who negotiated a settlement offer from Schmidt in the amount of 1.2 million dollars, or $200,000.00 more than KMIC's policy limits, and demanded that KMIC pay that amount to settle the judgment. Instead, KMIC paid Schmidt its policy limits of one million dollars, plus interest, in partial satisfaction of the judgment against Tabler. Tabler then executed a written assignment to Schmidt of any "bad faith" claim Tabler might have against KMIC for . its failure to settle Schmidt's claim and/or judgment; and, in exchange, Schmidt re-

leased Tabler from any liability for the excess judgment. Schmidt then filed this derivative action against KMIC for the unpaid balance of his judgment against Tabler. *See generally Manchester Ins. & Indem. Co. v. Grundy,* 531 S.W.2d 493 (Ky.1975); *Terrell v. Western Cas. & Sur. Co.,* 427 S.W.2d 825 (Ky.1968); *Grundy v. Manchester Ins. & Indem. Co.,* 425 S.W.2d 735 (Ky.1968). The "bad faith" case was tried before a Jefferson Circuit Court jury in April 2002. Dr. Tabler testified on direct examination as a witness for Schmidt, *inter alia,* that he "did not recall" being warned by his attorneys of his potential exposure to liability in excess of his policy limits and that he "did not understand" that he could be personally, as well as corporately, liable for an excess judgment. He also denied withholding his consent to a settlement of Schmidt's claim. However, when confronted on cross-examination with sworn statements he had previously made during a discovery deposition, he admitted:

- That he had reviewed the "settlement brochure" prepared by Schmidt's attorney claiming over $900,000.00 in medical bills, demanding five million dollars in settlement, and advising that he (Tabler) would be personally liable for any excess judgment over his policy limits;

- That he received and read KMIC's "excess letter" advising him that any damages over the one million dollar policy limits were his responsibility and that he could obtain personal counsel;

- That he wanted "his day in court" to "tell his story to a jury of twelve people" and "to be exonerated of any wrongdoing" "because he did nothing wrong;"

- That he had no complaints about his lawyers; that they were prepared to

try the case, he trusted them and they were honest with him; that they did not mislead him or tell him not to settle the case; that they provided him with medical literature which supported his position and met with him frequently; and that the expert witness they retained was more believable and intellectually honest than the expert retained by Schmidt;

● That he knew that his insurance limits were one million dollars, but regardless of whether his limits were $100,000.00 or five million dollars, he wanted to take the case to verdict and he did not want to settle;

● That he knew there were no guarantees in litigation and that he was told by his lawyers that if the jury believed Schmidt's expert and disbelieved him and his expert, he would lose the case;

● That he had conversations with his lawyers regarding the potential for a verdict in excess of his policy limits and the fact that the exposure would be both personal and corporate;

● That if KMIC had settled the "Schmidt v. Tabler" case without his consent, he would have sought legal counsel, and that he was concerned about any settlements being reported to the National Practitioners Data Bank;[1]

● That, prior to trial, he consulted with his corporate/personal attorney regarding what would happen to his residence, which was titled in his wife's name, and to assets he had placed in trust in the event a verdict was rendered against him in excess of his policy limits.

The attorneys who had represented Tabler in the malpractice action also testified that they had advised Tabler of the risks of going to trial but that he was convinced that he had done nothing wrong and that he would be exonerated by the jury.[2] At the conclusion of the evidence in the "bad faith" trial, the jury returned a verdict answering "Yes" to the following interrogatory:

Do you believe, from the evidence presented in this case, that Dr. Tabler, during the litigation of the claim against him by the plaintiffs, did not give his consent to a settlement of the case after KMIC had conducted reasonable investigation based upon all available information and after being fully informed of the results of that investigation and the risks of not settling?

Having answered "Yes" to that interrogatory, the jury, pursuant to the trial court's

---

1. *See, e.g., Brion v. Vigilant Ins. Co.,* 651 S.W.2d 183, 184–85 (Mo.Ct.App.1983) (holding that insured psychiatrist could maintain cause of action against insurer for settlement of patient's malpractice claim without psychiatrist's consent, seeking damages for loss of malicious prosecution claim; embarrassment, humiliation, and disgrace individually and professionally; loss of reputation and standing in the community as a psychiatrist; mental anguish; and loss of time and earnings and attorneys' fees incurred in unsuccessful prosecution of claim for malicious prosecution); *Lieberman v. Employers Ins. of Wausau,* 84 N.J. 325, 419 A.2d 417, 423–25 (1980) (holding that insured neurosurgeon could maintain cause of action against both insurer and attorney for settlement of patient's malpractice claim without neurosurgeon's consent, seeking damages for injury to reputation and malpractice liability insurance premium surcharges).

2. Tabler had corresponded with the drug manufacturer, who told him that there was only one reported case worldwide involving Lithium and aplastic anemia and no reported cases involving Steiazine. He had also spoken with Mrs. Schmidt's subsequent treating physician who told him that Mrs. Schmidt's aplastic anemia was idiopathic (of unknown cause).

instructions, did not reach the instructions on whether KMIC's refusal to settle constituted "bad faith" but simply returned a verdict in favor of KMIC, awarding Schmidt nothing.

■ The Court of Appeals reversed and remanded for a new trial, citing Dr. Tabler's testimony on direct examination and disregarding his testimony on cross-examination. It also held that the jury should have been permitted to consider whether KMIC's failure to pay the post-verdict settlement offer of 1.2 million dollars constituted "bad faith," citing avowal testimony by Tabler's personal attorney that KMIC could have paid the additional $200,000.00 out of "unused defense costs" saved by the fact that Tabler chose not to appeal the judgment.[3] We granted discretionary review and now reverse the Court of Appeals and reinstate the judgment of the trial court. There was ample evidence to support the jury's finding that, after being "fully informed" of the risks, Dr. Tabler did not consent to a compromise settlement prior to the return of the excess liability verdict. The Court of Appeals erred in usurping the fact-finding authority of the jury on this issue.

■ An insurer acts in "bad faith" with respect to a potential excess judgment against its insured only if it is afforded the opportunity to settle within the policy limits. *Davis v. Home Indem. Co.*, 659 S.W.2d 185, 189 (Ky.1983) ("[T]he first premise is that the insurance carrier has been presented with an opportunity to settle within the policy limits."). In *Davis*, the insured demanded that its insurer settle within the policy limits, but the plaintiff never offered to settle for that amount. Rejecting an argument that the insurer is

required to offer its policy limits in the absence of a demand therefor, we held that, without such a demand, there could be no "bad faith" refusal to settle that would give rise to liability for an excess judgment. *Id.* Here, the plaintiff was willing to settle for the policy limits, but the insured exercised his right under the policy to withhold consent to any such settlement, thus denying the insured the opportunity to settle within the policy limits.

■ Compare this scenario with the usual case in which the policy gives the insurer absolute control over settlement. *E.g., Terrell*, 427 S.W.2d at 828 ("The insurer has control of the defense and settlement of the claim."); *Grundy*, 425 S.W.2d at 737 ("Under the terms of the policy, the insurer alone had the right and power to settle."); *Am. Sur. Co. of N.Y. v. J.F. Schneider & Son*, 307 S.W.2d 192, 195 (Ky.1957) ("As insurer, appellant was authorized to effect any compromise or settlement of the claims it considered just and advantageous provided it acted in good faith in so doing."), *overruled on other grounds by Manchester Ins. & Indem. Co. v. Grundy*, 531 S.W.2d 493 (Ky.1975). Where the insured retains the right to consent to settlement and withholds that consent, the insurer's failure to settle cannot be deemed "bad faith" that would give rise to liability for an excess judgment. *Carlile v. Farmers Ins. Exch.*, 173 Cal. App.3d 975, 219 Cal.Rptr. 773, 777 (1985) (where insurance policy contained "consent to settle" clause and insured hospital withheld consent, insurer's failure to negotiate with plaintiff did not violate California's Unfair Practices Act, Cal. Ins.Code § 790.03). That is particularly true where, as here, the plaintiff's "bad faith" claim is

---

**3.** Although KMIC's policy covered costs and fees incurred during an appeal, it only covered the cost of an appeal bond to the extent of its policy limits and only its pro rata share of interest payable on the judgment. Thus, the policy required Tabler to supersede the excess portion of the judgment and to pay any interest thereon.

derivative of the insured's right to make such a claim. *Cf. Eklund v. Safeco Ins. Co. of Am.,* 41 Colo.App. 96, 579 P.2d 1185, 1187 (1978) (holding insurer entitled to summary judgment in action by insured's bankruptcy trustee seeking to hold insurer liable for excess judgment when insured had adamantly opposed settlement).

 The trial court correctly declined to submit to the jury the issue of KMIC's failure to pay a post-verdict settlement offer in excess of its policy limits. An insurer is liable for a judgment against its insured in excess of the policy limits only if it refused in "bad faith" to pay a settlement demand within its policy limits. *Harvin v. U.S. Fid. & Guar. Co.,* 428 S.W.2d 213, 215 (Ky.1968). An insurer does not act in "bad faith" by failing to pay a settlement demand that exceeds its policy limits. *Motorists Mut. Ins. Co. v. Glass,* 996 S.W.2d 437, 453 (Ky.1997); *Cooper v. Auto. Club Ins. Co.,* 638 S.W.2d 280, 282 (Ky.App.1981); *Schlauch v. Hartford Accident & Indem. Co.,* 146 Cal.App.3d 926, 194 Cal.Rptr. 658, 664 (1983) ("While Hartford had a duty to protect its insured from an excess judgment, it had no duty to either its insured or third party claimants to settle for any amount in excess of the policy limits. Its settlement duty to the insureds and claimants alike was limited to the policy limits."). While some insurance policies have provisions that deduct the cost of defense from the liability limits, *see, e.g., Aetna Cas. & Sur. Co. v. Commonwealth, Natural Res. & Envtl. Prot. Cabinet,* 179 S.W.3d 830, 840–41 (Ky.2005), neither Schmidt nor the Court of Appeals has cited any authority, and we have found none, holding that "unused defense costs" increase the liability coverage limits of an insurance policy. Paragraphs B, C, and E of Tabler's KMIC policy clarify that the cost of defense is a separate and distinct obligation from its maximum obligation to pay damages, *i.e.,* its liability coverage limits, *viz:*

B. Upon receipt of notice the Company shall immediately assume its responsibility for the defense of any such claim and shall retain legal counsel, who shall defend in conjunction with the claims department of the Company. Such defense shall be maintained until final judgment in favor of the Insured shall have been obtained or until all remedies by appeal, writ of error or other legal proceedings deemed reasonable and appropriate by this Company shall have been exhausted at the Company's cost and without limit as to the amount expended. However, the Company shall not be obligated to incur any further defense cost nor provide any further defense of any kind on any pending or further claims or suits after the "annual aggregate" limit of this policy has been exhausted by the payment of judgments or settlements.

C. The Company shall furnish a bond not to exceed the limit of liability for each medical incident herein, required to appeal a judgment hereunder, but shall not be liable for more than a pro rata share of interest payments on appealed judgments.

D. Except for the cost of defense provided under Section B and the premium on any bond furnished under Section C, the Company's liability ... shall not exceed the stated maximum amount for any one occurrence (each medical incident) and, subject to the same limit for each occurrence, the Company's total liability during any one policy year shall not exceed the stated maximum amount (annual aggregate).

The policy limits under Tabler's KMIC policy were one million dollars per occur-

rence and three million dollars annual aggregate.

Our cases clearly distinguish between an insurer's duty to defend and its duty to indemnify. *Cincinnati Ins. Co. v. Vance,* 730 S.W.2d 521, 522–23 (Ky.1987); *Wilcox v. Bd. of Educ.,* 779 S.W.2d 221, 223 (Ky. App.1989). KMIC's duty to defend Tabler might have required it to prosecute an appeal, even after paying its liability limits, if Tabler had so demanded and if there were reasonable grounds for appeal. *Ursprung v. Safeco Ins. Co. of Am.,* 497 S.W.2d 726, 730–31 (Ky.1973). However, Tabler did not demand an appeal and Schmidt does not assert that there were reasonable grounds therefor. Regardless, the failure to appeal did not metamorphose any "unused defense costs" that might otherwise have been incurred during such an appeal into increased liability coverage.

To summarize, since the excess judgment against Tabler was not the result of any "bad faith" on its part, KMIC was not required to pay any portion of the judgment that exceeded the liability limits of its policy—and, *ipso facto,* its refusal to pay any portion of the judgment that exceeded the liability limits of its policy could not be the basis for a separate claim of bad faith.

Accordingly, we reverse the Court of Appeals and reinstate the judgment of the Jefferson Circuit Court.

All concur.