RENDERED:  NOVEMBER 20, 2020; 10:00 A.M.
TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2018-CA-1494-MR


BOWLIN GROUP, LLC                                                  APPELLANT



APPEAL FROM BOONE CIRCUIT COURT
v.        HONORABLE GREGORY M. BARTLETT, SPECIAL JUDGE
ACTION NO. 16-CI-00203



CHRISTINA REBENNACK, INDIVIDUALLY,
AS PERSONAL REPRESENTATIVE OF THE
ESTATE OF JOEL REBENNACK, AND AS
MOTHER AND NEXT FRIEND OF ELIJAH
REBENNACK; MELANIE REBENNACK; AND
ARIANNA REBENNACK                                                  APPELLEES


AND
NO. 2019-CA-0078-MR



CHRISTINA REBENNACK, INDIVIDUALLY,
AS ADMINISTRATRIX OF THE ESTATE OF
JOEL REBENNACK, AND AS MOTHER AND
NEXT FRIEND OF ELIJAH REBENNACK; MELANIE
REBENNACK; AND ARIANNA REBENNACK                                   APPELLANTS

v.    HONORABLE GREGORY M. BARTLETT, SPECIAL JUDGE
ACTION NO. 16-CI-00203


WESTCHESTER FIRE
INSURANCE COMPANY                                              APPELLEE


OPINION
AFFIRMING IN PART, VACATING IN PART, AND REMANDING

** ** ** ** **

BEFORE:  GOODWINE, TAYLOR, AND K. THOMPSON, JUDGES.

THOMPSON, K., JUDGE:  In February 2015, Joel Rebennack died after being struck by a vehicle driven by an intoxicated Brenda Amerson.  Because Joel was working when he was struck, Bowlin Group, LLC paid workers' compensation to his estate and, pursuant to a settlement, is obligated to pay substantial future benefits.  Joel Rebennack's widow, Christina Rebennack (on behalf of herself, Joel's estate, and their three minor children—collectively "Christina"), sued Amerson, an Elks Lodge where Amerson drank alcohol prior to the tragic accident, and some individuals associated with the lodge (collectively the "Elks defendants").  Bowlin Group intervened to assert its subrogation rights.

Christina eventually settled with the Elks defendants.  The trial court denied Bowlin Group's request to use that settlement to receive a credit against its

future obligations, instead granting summary judgment to Christina. Bowlin Group then filed appeal 2018-CA-1494-MR.

Meanwhile, Christina also filed bad-faith claims against Westchester Fire Insurance Company, the Elks defendants' excess insurance provider. However, without affording Christina an opportunity to engage in discovery on her bad-faith claims, the trial court granted summary judgment to Westchester. Christina then filed appeal 2019-CA-0078-MR. Since the appeals spring from the same facts and circuit court case, we will resolve both in this combined Opinion. Having considered the parties' arguments and applicable law, we affirm the decision to grant summary judgment to Christina in Bowlin Group's appeal and vacate the decision to grant summary judgment to Westchester without affording Christina a chance to engage in discovery.

## I. Sealing the Briefs

Before we analyze the issues, we must address a procedural matter left open by a previous procedural order of this Court. Specifically, the parties seek to seal the briefs in both appeals, essentially because they contain discussion of matters ordered sealed by the trial court—principally, the settlement(s) and offers of settlement. The previous order provisionally granted the motion but noted the decision would be revisited by the merits panel. "This Court retains authority to review decisions on motion panel that do not finally dispose of the case when the

-3-

case is considered by a full-judge panel to which it is assigned." *Commonwealth Bank & Tr. Co. v. Young*, 361 S.W.3d 344, 350 (Ky.App. 2012).

Kentucky Rule of Civil Procedure (CR) 7.03(4) provides in relevant part that "[f]or good cause, the court may by order in a case . . . limit or prohibit a nonparty's access to a document filed with the court." The question before us is not whether the trial court erred by permitting documents to be filed under seal. No one has challenged that decision, so we will not address it. *Maclean v. Middleton*, 419 S.W.3d 755, 761 (Ky.App. 2014) ("We certainly agree that court records should not be sealed as a matter of routine practice simply at the request of the parties. But in the absence of any challenge to the order, the issue is not before this Court and we have no authority to disturb the trial court's decision to seal the record."). Instead, the question is whether the appellate briefs should be sealed.

Generally, there is a presumption in favor of public disclosure of court records. *Id.* Here, however, the briefs contain discussion of settlement amounts and offers, which is unsurprising given Christina's bad-faith claims and Bowlin Group's request for a credit against its future obligations. There is authority holding that public disclosure of the offers and counteroffers endemic to any settlement effort is generally inappropriate. *See*, *e.g.*, *Goodyear Tire & Rubber Co. v. Chiles Power Supply, Inc.*, 332 F.3d 976, 980 (6th Cir. 2003) (citation omitted) ("There exists a strong public interest in favor of secrecy of matters

discussed by parties during settlement negotiations. . . . Moreover, confidential settlement communications are a tradition in this country."). To help preserve the sanctity of the settlement process, we will not disturb the decision to seal the briefs.

## II. Bowlin Group's Appeal (2018-CA-1494-MR)

Bowlin Group's appeal requires us to determine whether Kentucky Revised Statute (KRS) 342.700(1) entitles it to an offset for future benefits owed Christina. We review the "substance of a trial court's summary judgment ruling *de novo*, *i.e.*, to determine whether the record reflects a genuine issue of material fact . . . ." *Blankenship v. Collier*, 302 S.W.3d 665, 668 (Ky. 2010).

In relevant part, the applicable version of KRS 342.700(1) provided:

> Whenever an injury for which compensation is payable under this chapter has been sustained under circumstances creating in some other person than the employer a legal liability to pay damages, the injured employee may either claim compensation or proceed at law by civil action against the other person to recover damages, or proceed both against the employer for compensation and the other person to recover damages, but he shall not collect from both. . . . If compensation is awarded under this chapter, the employer, . . . having paid the compensation or having become liable therefor, may recover in his or its own name or that of the injured employee from the other person in whom legal liability for damages exists, not to exceed the indemnity paid and

-5-

> payable to the injured employee, less the employee's
> legal fees and expense.[1]

KRS 342.700(1) "permits injured workers to seek full recovery for their injuries by allowing such workers to receive compensation from both the employer and a third-party tortfeasor so long as the injured worker does not receive double recovery for the injuries." *AIK Selective Self-Insurance Fund v. Minton*, 192 S.W.3d 415, 419 n.2 (Ky. 2006) (citation omitted). But determining what is a double recovery is not always simple.

It is uncontested that the settlement Christina reached with the Elks defendants is for an amount which dwarfs the maximum possible benefits the Bowlin Group may owe.[2] It is also uncontested that Christina's attorney fees exceed the maximum possible benefits the Bowlin Group may owe. Bowlin Group stresses that not allowing it to receive a credit against its future obligations due to Christina's substantial tort recovery would allow her to receive an impermissible double recovery.[3] On the other hand, Christina stresses language in KRS

---

[1] KRS 342.700 was amended in 2018, but all parties agree the prior version of the statute applies here, and 2018 Kentucky Acts Ch. 40 (HB 2) § 20 explicitly provides that the amendments to KRS 342.700 apply to claims based upon injuries "occurring on or after the effective date of this Act." Thus, our analysis will be based upon the prior version of KRS 342.700.

[2] The precise amount of Bowlin Group's obligations to Christina is unknowable since it is contingent upon future events which may or may not occur, such as remarriage.

[3] Bowlin Group is only entitled to subrogation/credit for any settlement funds stemming from Joel's lost wages, not his pain and suffering. *See, e.g.*, *Hillman v. American Mut. Liability Ins. Co.*, 631 S.W.2d 848, 850 (Ky. 1982) ("Although compensation benefits are calculated on the

342.700(1) which states that an employer's subrogation recovery must be reduced by an injured employee's legal fees. Since her legal fees exceed Bowlin Group's maximum liability, she argues Bowlin Group's ability to receive subrogation credits has been eliminated. Though the parties argue to the contrary, we have found no precedent with similar facts which directly resolves this issue.

Bowlin Group chiefly relies upon *AIK Selective Self Insurance Fund v. Bush*, 74 S.W.3d 251 (Ky. 2002), to support its contention that it is entitled to an offset of its future obligations. In *Bush*, an injured worker settled with his employer's workers' compensation carrier and then sued the alleged tortfeasor; the compensation carrier filed a complaint against the tortfeasor "to recoup the workers' compensation benefits it had paid and would pay to Bush because of his injury." *Id.* at 252. A jury apportioned 25% of the fault to the tortfeasor and 75% to the worker's employer. The question on appeal was whether the employer's

---

basis of lost earnings, the percentage of disability reflects the loss of future earnings and earning power as well. To the extent, therefore, that the claimant recovers these items of damage against a third-party tortfeasor, the compensation carrier is subrogated and, we believe, is entitled to be reimbursed before the claimant collects. To the extent, however, that the recovery against the tortfeasor represents items of damage (e.g., pain and suffering) not covered by workers' compensation, the carrier has no right against that recovery at all."). Christina's settlement with the Elks defendants did not allocate a specific amount for Joel's lost income. However, Christina claimed a significant amount for Joel's lost income in a pre-settlement itemization of damages. "The burden of proving the affirmative defense of entitlement to a credit is on the employer. Where prima facie evidence of a credit is introduced, the burden of going forward with evidence that a portion of the tort recovery is not available for subrogation credit should be properly placed on the employee." *Whittaker v. Hardin*, 32 S.W.3d 497, 499 (Ky. 2000). The fact that Christina claimed lost income and settled for an amount well over twice that claimed lost income amount is prima facie evidence that at least some portion of the settlement was for Joel's lost income, and Christina has not met her burden to show to the contrary.

insurer was entitled to recoup past and future amounts owed to the worker. Our Supreme Court held that the employer was entitled to recover 25% of its past *and future* workers' compensation payments (since the employer was found 75% at fault) to avoid the worker receiving an impermissible double recovery. *Id.* at 255 (citation omitted) ("AIK can recover no more than 25% of its total subrogation claim and . . . its recovery can be applied only against those elements of damages awarded in the judgment that correspond to the workers' compensation benefits that it paid, *i.e.*, past and future lost wages and medical expenses.").

We agree with the Bowlin Group that the Court in *Bush* held that the employer was entitled to a credit for future medical expenses, which are roughly akin to the future compensation payments owed to Christina here.[4] But even if we were to conclude that *Bush* means that an employer is generally entitled to a credit for its future obligations, *Bush* does not address a situation where an injured employee's legal fees exceed the employer's liability. Indeed, in *Bush* the Court remanded the matter to the trial court because the record did not reflect the amount of the claimant's legal fees. *Id.* at 258.[5]

---

[4] Obviously, Joel's death precludes his having post-settlement medical expenses, so the facts in *Bush* are analogous, not directly on point.

[5] We have also considered the other cases relied upon by Bowlin Group and Christina, but we will not belabor this already lengthy Opinion by discussing each cited case as we conclude none is directly on point sufficient to resolve this appeal.

We also cannot find the answer in the main case upon which Christina relies, *Minton*, 192 S.W.3d 415. In *Minton*, an employee collected workers' compensation benefits, filed a tort claim against the third party who allegedly caused the injury, and the employer intervened to raise its subrogation claim. After the employee settled with the third party, the trial court denied the employer any right to subrogation because the employee's legal fees exceeded the benefits paid by the employer. The employer appealed, arguing it was unfair to deduct the employee's entire legal fees since some of the fees were incurred for pursuing tort damages. However, stressing the plain language of KRS 342.700(1), our Supreme Court disagreed and held it was not unfair to use an employee's entire legal expenses to reduce, or even eliminate, an employer's subrogation amount.[6]

We agree with Christina that *Minton* reached the unremarkable conclusion that courts construe KRS 342.700(1) according to its plain meaning. We also agree with Christina that *Minton* shows that an employee's legal fees can "wipe[] out" an employer's subrogation recoupment. *Id.* at 417. However, *Minton* does not directly answer the credits-against-future-obligations issue since it involved an employer seeking credit for past payments and mainly focused on

---

[6] We note that the current version of KRS 342.700(1) now provides that only a "pro rata share of the employee's legal fees and expense" shall be used to reduce an employer's subrogation amount. But, as previously explained, we must apply the older version of that statute.

whether the entirety of an employee's legal fees should impact an employer's subrogation efforts—an issue not present here.

Because precedent does not directly answer the issue, we must analyze closely the language of KRS 342.700(1). When analyzing a statute, a court must look to the plain meaning of the words therein; if the language is clear, the court must afford the statutory language its plain meaning and the "inquiry ends." *Travelers Indemnity Company v. Armstrong*, 565 S.W.3d 550, 558 (Ky. 2018) (citation omitted).

We must also attempt to "carry out the intent of the legislature" by "consider[ing] the intended purpose of the statute-and the mischief intended to be remedied." *Monumental Life Ins. Co. v. Department of Revenue*, 294 S.W.3d 10, 19 (Ky.App. 2008) (quotation marks and citation omitted). Indeed, the General Assembly has enacted a statute mandating that "[a]ll statutes of this state shall be liberally construed with a view to promote their objects and carry out the intent of the legislature . . . ." KRS 446.080(1). And "[t]he primary purpose of the Workers' Compensation Act is to aid injured or deceased workers" so we must "interpret the workers' compensation statutes in a manner that is consistent with their beneficent purpose." *Kentucky Uninsured Employers' Fund v. Hoskins*, 449 S.W.3d 753, 762 (Ky. 2014) (citations omitted).

In relevant part, KRS 342.700(1) provides that if an employee is awarded workers' compensation, the employer "may recover . . . from the other person in whom legal liability for damages exists" an amount "not to exceed the indemnity paid and payable to the injured employee, less the employee's legal fees . . . ." The statute plainly permits Bowlin Group (employer) to recover from a third party who caused its employee damages (Amerson and the Elks), which it did, pursuant to a settlement, albeit for significantly less than its future obligations to Christina. But, in real world terms, accepting Bowlin Group's arguments would allow it to recover *from Christina* since affording it a credit against its future obligations would result in a dollar-for-dollar reduction in the funds she receives. Reducing the funds paid to an injured worker's estate does not serve the beneficent, worker-focused aim of our workers' compensation system. As our Supreme Court held in *Minton*, workers' compensation is a contract between the employer and employee, and "for the injured worker to receive the full benefit of his bargain, his right to receive a maximum recovery under the statute must take priority over the right of the employer/insurer to receive reimbursement for the benefits which it was already obligated to pay by contract." *Minton*, 192 S.W.3d at 419 (citation omitted). We can only accept Bowlin Group's argument, therefore, if compelled to do so by the plain language of KRS 342.700(1)—which we are not.

The plain language of KRS 342.700(1) weighs in Christina's favor. There is no language in the statute which would logically lead to a conclusion that the entirety of Christina's substantial legal fees should not apply to Bowlin Group's subrogation rights. Instead, the General Assembly used blanket language to state broadly that the amount the employer has paid, and will pay, to its injured employee (amounts "paid and payable") *must* be reduced by "the employee's legal fees . . . ." We cannot judicially graft a distinction onto a statute which does not contain one. And sometimes an employee's legal fees are so large that they eliminate an employer's subrogation rights. Indeed, our Supreme Court recognized in *Minton* that the employer's subrogation fees in that case were "wiped out" by the employee's large legal fees. *Minton*, 192 S.W.3d at 417.

Finally, we reject Bowlin Group's argument that the trial court allowed Christina to have an impermissible "double recovery." Although it did not involve the precise question before us, our Supreme Court in *Minton* explained at length how reducing/eliminating an employer's subrogation rights by the full amount of an employee's legal fees did not mean the employee had obtained a double recovery:

> Tort claims involve a significant risk and require substantial energy in pursuing recovery. It is only fair to require employers/insurers benefiting from the fruits of such an endeavor to share in its costs . . . . Moreover, it is not arbitrary that the entire cost of pursuing the tort award (including those portions which do not duplicate

-12-

the benefits paid as workers' compensation) should be deducted from an employer/insurer's subrogation credit.

Under the common law, subrogees had no right to subrogation until the injured party was "made whole." *Wine v. Globe American Casualty Co.*, 917 S.W.2d 558, 561-62 (Ky. 1996). In other words, the injured party must be fully compensated for all of his or her injuries before the subrogee is entitled to reimbursement. *Id.* This doctrine recognized the basic premise that the right of the injured party to receive full recovery for his or her injuries is superior to the right of the subrogee to receive a credit for benefits previously paid on behalf of the injured party.

While the "made whole" doctrine may not be employed to trump or undermine the statutory subrogation scheme set forth in workers' compensation cases, *see Bush*, *supra*, at 255-56, its underlying principles remain relevant when explicating the statute's primary functions. Paying workers' compensation benefits is an obligation derived by contract. In exchange for agreeing to pay benefits, employer-subrogees receive revenues and profits from the labor of its employees, as does the insurer-subrogee consequently receive its revenue and profits from the premiums paid by the employer. Thus, in order for the injured worker to receive the full benefit of his bargain, his right to receive a maximum recovery under the statute must take priority over the right of the employer/insurer to receive reimbursement for the benefits which it was already obligated to pay by contract. *See Wine*, *supra*. The conditional right to subrogation authorized under KRS 342.700(1) merely recognizes and codifies this underlying principle of the "made whole" doctrine.

*In this case, Appellees are not receiving double recovery for Mr. Minton's injuries because a portion of the tort award must be utilized to pay legal fees and expenses. This diversion of funds has resulted in*

-13-

> *Appellees receiving less than full compensation for those*
> *injuries. Under such circumstances, it is reasonable for*
> *the legislature to deny employer/insurers an additional*
> *subrogation credit from the tort award unless the*
> *employer/insurer's subrogation claim is greater than the*
> *costs incurred to pursue the tort award.*

*Minton*, 192 S.W.3d at 418-19 (emphasis added) (citation and footnote omitted).[7]

In sum, we agree with Bowlin Group that, generally, an employer is entitled to a subrogation-type credit against its future obligations when an employee recovers from a third-party tortfeasor. However, we disagree with Bowlin Group that it is entitled to that credit because the statute is plain: an employee's entire legal fees offset an employer's subrogation/future credit rights. Here, Christina's legal fees vastly exceed Bowlin Group's obligations. Thus, Bowlin Group's general entitlement to credits against its future obligations is "wiped out . . . ." *Id.* at 417. Because that is the same bottom line conclusion reached by the trial court, we affirm.

### III. Christina's Appeal (2019-CA-0078-MR)

Christina's appeal focuses on Westchester's handling of her claims against the Elks defendants, for whom Westchester was the excess insurance

---

[7] As Justice Cooper noted in his concurring opinion in *Minton*, there is tension between the Kentucky Supreme Court's rejection of the "made whole" doctrine in *Bush*, 74 S.W.3d at 255-57, and its statement in *Minton* that KRS 342.700(1) was a legislative codification of that doctrine. 192 S.W.3d at 418-19. Although the differences between *Bush* and *Minton* could lead to confusion, it does not impact the result here.

provider.  Because the trial court granted summary judgment to Westchester, the following facts are related in the light most favorable to Christina.

According to Christina, it was obvious that the Elks violated Kentucky's Dram Shop Act, KRS 413.241,[8] by serving alcohol to an already intoxicated Amerson shortly before she drove her vehicle into Joel.  Indeed, it is uncontested that she drank alcohol at the Elks Lodge for an extended period shortly before the fatal accident and, after her arrest, her blood alcohol level was over twice the legal limit.  Thus, in Christina's view, its insured(s)' conduct made Westchester's liability clear all along, so its handling of her claims against the Elks defendants violated Kentucky's Unfair Claims Settlement Practices Act (KUCSPA).  *See*, *e.g.*, KRS 304.12-230(6) (providing that it is an unfair claims settlement practice when a person does "[n]ot attempt[] in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear").  Indeed, Christina asserts that, even though it was the excess insurer, Westchester was "controlling the terms of its Insured's pre-trial strategy

---

[8] KRS 413.241(2) provides in relevant part:

> [N]o person . . . who sells or serves intoxicating beverages to a person . . . shall be liable to that person or to any other person . . . for any injury suffered off the premises including but not limited to wrongful death and property damage, because of the intoxication of the person to whom the intoxicating beverages were sold or served, unless a reasonable person under the same or similar circumstances should know that the person served is already intoxicated . . . .

and dictating the timing and amount of their eventual settlement offers—which also included and incorporated the underlying, self-insured amount." Appellants' brief at 4.

Specifically, Christina asserts she offered to settle with the Elks defendants in June 2016 for an amount above Westchester's policy limits but below the total funds available to those defendants via additional policies from other insurance companies;[9] Westchester said it needed to conduct discovery before responding. After taking some depositions, Christina increased her settlement demand; Westchester again said it needed to conduct discovery before responding. Extensive discovery continued. At a December 2016 mediation, Westchester made its first offer, but its then-maximum offer was only for about 18% of its potential liability, including the Elks' self-insured amount—far less than Christina's expert had valued Joel's loss of earning capacity and household services alone. Soon thereafter, Christina filed these bad-faith claims against Westchester. The trial court stayed discovery on those claims while Christina's underlying claims progressed.

Shortly after filing the bad-faith claims, Christina offered to settle with Westchester for its policy limits, but Westchester only nominally increased its

[9] The other insurance companies are not parties to this appeal, nor were they named as parties in Christina's bad-faith action. Thus, we express no opinion on the applicability of those policies, nor is our decision based upon them.

counteroffer.  Later, Westchester offered 40% of its policy limits, conditioned on Christina dismissing her bad-faith claims.  In September 2017, only five days before the trial, Christina and Westchester settled her underlying claims for 65% of Westchester's policy limits, including the underlying coverage.

In February 2018, the trial court lifted the discovery stay on the bad-faith claims, and Christina propounded interrogatories and requests for production of documents to Westchester.  But before Westchester answered, it persuaded the trial court to reinstate the discovery stay and moved for summary judgment.  In December 2018, without Christina having conducted any discovery, the trial court granted Westchester's motion for summary judgment, concluding there was no evidence Westchester had acted sufficiently outrageously to support a bad-faith claim.  Christina then filed this appeal.

Normally, we would examine whether the record supports the trial court's decision to grant summary judgment to Westchester.  Indeed, many of the cases cited by the parties contain that type of analysis particularized to bad-faith claims.  But here, among other things, Christina argues the trial court acted prematurely by granting summary judgment without letting her conduct discovery.  We agree.  Thus, because a premature summary judgment inevitably leads the record to be fatally incomplete, we do not address whether the embryonic record supports granting summary judgment to Westchester.  *Suter v. Mazyck*, 226

S.W.3d 837, 842 (Ky.App. 2007) (holding that "for summary judgment to be properly granted, the party opposing the motion must have been given adequate opportunity to discover the relevant facts. Only if that opportunity was given do we reach the issue of whether there were any material issues of fact precluding summary judgment."). Instead, we shall only discuss whether the record, such as it is, could possibly be sufficient for Christina to make out viable bad-faith claims.

Although CR 56.02 permits a party to move for summary judgment "at any time," our Supreme Court has "cautioned trial courts not to take up these motions prematurely and to consider summary judgment motions only after the opposing party has been given ample opportunity to complete discovery." *Blankenship*, 302 S.W.3d at 668 (quotation marks and citation omitted). We "consider whether the trial court gave the party opposing the motion an ample opportunity to respond and complete discovery before the court entered its ruling[,]" a decision which we review for abuse of discretion. *Id.* The question is not whether the nonmoving party "has actually completed discovery"—rather, the question is whether the nonmoving party "has had an opportunity to do so." *Hartford Ins. Group v. Citizens Fidelity Bank & Tr. Co.*, 579 S.W.2d 628, 630 (Ky.App. 1979).

Christina had less than a month to perform discovery on her bad-faith claims. In that extremely short period, she sent Westchester discovery requests,

which it did not answer. In practical effect, Christina had *no* opportunity to conduct discovery on her bad-faith claims. We must determine whether that utter lack of discovery matters since Westchester contends any discovery Christina could have conducted would not have helped her make a colorable bad-faith claim.

To succeed on a bad-faith claim, the claimant must show an insurer: (1) was "obligated to pay the claim under the terms of the policy;" (2) "lack[ed] a reasonable basis in law or fact for denying the claim;" and (3) "either knew there was no reasonable basis for denying the claim or acted with reckless disregard for whether such a basis existed." *Indiana Ins. Co. v. Demetre*, 527 S.W.3d 12, 26 (Ky. 2017) (quoting *Davidson v. American Freightways, Inc.*, 25 S.W.3d 94, 100 (Ky. 2000)). The third element "requires evidence that the insurer's conduct was outrageous, or because of his reckless indifference to the rights of others" because a bad faith claim is "a punitive action." *Hollaway v. Direct General Ins. Co. of Mississippi, Inc.*, 497 S.W.3d 733, 738 & 739 (Ky. 2016) (footnote omitted).

Westchester argues the first element is not met because it was not obligated to pay until the underlying insurance was exhausted, which did not occur until soon before Christina settled with the Elks defendants. *See Motorists Mut. Ins. Co. v. Glass*, 996 S.W.2d 437, 453 (Ky. 1997) (citation omitted) ("Farm Bureau did not receive notice of this accident until August 17, 1988. As the 'excess' insurer, it did not owe any coverage until Motorists Mutual's primary

-19-

coverage was exhausted."). However, the circumstances here—viewed in the light most favorable to Christina—are that Westchester was controlling the whole defense during the litigation, including when the underlying policy would be exhausted.[10] And we have held in an analogous situation, albeit in an unpublished Opinion (so we cite it only as an illustration, not as binding precedent), that when an insurer is responsible for both the underlying and excess coverage it may not refuse to negotiate a claim under the excess policy until the claimant exhausts the underlying policy. *Globe American Cas. Co. v. Bowman*, Nos. 2001-CA-001420-MR and 2001-CA-001508-MR, 2003 WL 21246382, at *5 (Ky.App. May 30, 2003) (quotation marks and citation omitted) ("[T]he Bowmans argue that a UIM [underinsured motorist] carrier cannot refuse to negotiate a one million dollar claim until the UIM insured can process a claim against the tortfeasor covered by a $25,000 limit liability policy to judgment. The Bowmans assert that this is particularly true where Globe was the insurer under both policies. We agree.").

Of course, we agree with Westchester that "mere delay in payment does not amount to outrageous conduct absent some affirmative act of harassment

---

[10] As will be discussed later, we cannot know with certainty when, or if, Westchester took control of the whole defense because the trial court granted summary judgment without allowing Christina to conduct discovery. However, in the light most favorable to Christina, Westchester should reasonably have known the underlying policy would be exhausted by no later than the December 2016 mediation since it offered to settle then for more than the underlying policy limits, but the case dragged on for many more months.

or deception." *Glass*, 996 S.W.2d at 452 (citation omitted). Instead, Christina must present "proof or evidence supporting a reasonable inference that the purpose of the delay was to extort a more favorable settlement . . . ." *Id.* at 452-53. But Christina has had no opportunity to adduce evidence in her bad-faith claims, especially since she has not been able to access Westchester's claims file. In the light most favorable to Christina, the local Elks facility served Amerson enough alcohol to make her highly inebriated when she collided with Joel, making the Elks defendants' liability clear, but Westchester continued to contest liability and did not even make a settlement offer until the case was roughly ten months old.

We also agree with Westchester that an insurer is not required to settle an action for an amount above the policy limits, *American Physicians Assur. Corp. v. Schmidt*, 187 S.W.3d 313, 318 (Ky. 2006), and Christina's initial offers were for more than the limits of Westchester's policy. However, the litigation continued well after Christina offered to settle for Westchester's policy limits.

Of course, the final settlement was for an amount below Westchester's policy limits, which the trial court seemed to believe precluded a bad-faith claim. Westchester points out the undisputed fact that the settlement was for less than its policy limits but does not assert that this inherently dooms Christina's claims, nor have we independently located authority so holding. Tellingly, the trial court did not cite any authority to support its apparent belief that

a bad-faith claim may only be filed if an underlying claim has been resolved for the policy limits. The KUCSPA requires an insurer to make reasonable attempts to settle *all* claims. But, under the trial court's logic, an insurer would be able to intentionally, outrageously delay resolution of a claim for less than its policy limits with impunity. Obviously, that would be antithetical to the goals of the KUCSPA.

In the light most favorable to Christina, she offered to settle with Westchester for its policy limits months before the final, lower settlement was achieved. Given the facts and circumstances of this case, and drawing all reasonable inferences in favor of Christina, we cannot say that it would be impossible for her to show—after being afforded reasonable discovery—that Westchester unreasonably delayed trying to resolve Christina's claims.

As to the second element, Westchester relies upon various items of evidence which would help show that its insureds' liability was not clear. Christina, on the other hand, points to other evidence showing the copious amount of alcohol the Elks defendants served Amerson prior to the fatal accident. Also, Christina notes that some Elks-associated entity even prepared a PowerPoint presentation about the case as a teaching point about irresponsibly serving alcohol at its facilities, including a statement that "[w]e [the Elks] overserved her

[Amerson] and we knew she was an alcoholic . . . ."[11] Appellants' brief, Exh. 5 at 22. Christina also stresses that she needs Westchester's claims file to ascertain when it concluded its insured(s) liability had been reasonably established.

It is impossible for a reviewing court to say whether a file not found in the record would help a party establish a claim. Taking the facts in the light most favorable to Christina, however, the file almost certainly shows when Westchester first believed its liability became clear. And discerning that date would let a reviewing court know how long afterwards it took Westchester to make reasonable settlement attempts. In fact, Kentucky's then-highest court held over fifty years ago in a bad faith case that "it is within the proper scope of discovery to inquire into and demand the production of all documents and material pertaining to any negotiations or offers of settlement." *Terrell v. Western Cas. & Sur. Co.*, 427 S.W.2d 825, 828 (Ky. 1968). *See also*, *e.g.*, *Riggs v. Schroering*, 822 S.W.2d 414, 415 (Ky. 1991) (holding that "*Terrell* recognizes that in the 'bad-faith-failure-to-settle' action which followed after the litigation against the insured was concluded, matters pertaining to the negotiation were a legitimate subject of discovery").

---

[11] It is unclear exactly which entity prepared the PowerPoint presentation. We need not resolve that question, nor any admissibility issues, as we cite it only to show that some people associated with the national Elks organization found fault with the Elks defendants well before the case was resolved.

Generally, therefore, Christina would have been entitled to receive at least some of the file in discovery.

Although she cannot know with certainty what is in the file, Christina did submit evidence which showed how obtaining it was necessary to her claims. Specifically, Christina presented the affidavit of a purported insurance industry expert[12] opining that Westchester "failed to make prompt or reasonable attempts to settle the underlying case when no reasonable claim person would fail to recognize liability as reasonably clear and damages as catastrophic." Appellants' brief, Exh. 2. However, the affiant stated that he needed to review Westchester's claims file to reach any definitive conclusions.[13]

---

[12] We express no opinion as to whether the affiant was qualified to be an expert as the parties do not raise that issue. We also express no opinion as to whether any part(s) of the file are exempt from discovery due to, for example, falling within the attorney-client privilege.

[13] Westchester argues the affidavit was untimely because Christina submitted it a few weeks after submitting her memorandum in opposition to Westchester's motion for summary judgment. However, the affidavit was submitted weeks before Westchester's reply brief was due and nearly six months before the trial court granted summary judgment to Westchester. And Westchester has not cited, nor did we independently locate, where it asked the trial court to strike the affidavit or otherwise argued it could not be considered. In short, Westchester basically ignored the affidavit until Christina filed this appeal.

CR 56.03 permits a party opposing summary judgment to present affidavits "prior to the day of hearing . . . ." There was no hearing on Westchester's motion. Kentucky precedent generally holds that a hearing is not completed "until the question is ready for a decision," and courts "should be extremely liberal in allowing the parties to present additional material up until the time the matter is ripe for decision." *Conley v. Hall*, 395 S.W.2d 575, 580 (Ky. 1965). The affidavit was submitted well before the matter was ready for the trial court's decision. Moreover, the trial court did not strike or exclude the affidavit, nor was it asked to so act. In short, we disagree that the affidavit could not be considered.

-24-

Unfortunately, the trial court did not mention the affidavit in its summary judgment decision. But the conclusion in the affidavit that the evidence shows that Westchester acted unreasonably, along with other evidence (the lack of offers by Westchester for about ten months, the extended discovery necessitated by Westchester's persistent refusal to admit its insured(s)' liability, and Westchester's relatively low offers until nearly the eve of trial), was sufficient to necessitate further discovery. Therefore, we disagree with Westchester that no amount of discovery by Christina could have helped her make a colorable bad-faith claim.

As can be seen here, each side can—and did, at length—cite to evidence which supports its view of Christina's bad-faith claims. But the ultimate merit of Christina's bad-faith claims is not the issue before us, and so we decline to wade further into the thicket of the parties' back and forth arguments about whether Westchester's actions or inactions constituted actionable bad faith. Instead, we merely hold that, in the light most favorable to her, Christina's bad-faith claims are not facially unmeritorious. Consequently, she should have been given the opportunity to conduct discovery. After reasonable discovery, it is possible that Westchester will properly be able to show that it is entitled to summary judgment. Or not. We cannot know how discovery will impact Christina's claims. Instead, we conclude only that she must be given a reasonable

chance to conduct discovery, after which—and only after which—the viability of her claims may appropriately be determined.

## IV. Conclusion

For the foregoing reasons, the trial court's decision in the Bowlin Group's appeal, 2018-CA-1494-MR, is affirmed and the trial court's decision to grant summary judgment to Westchester in appeal 2019-CA-0078-MR is vacated and remanded for further proceedings consistent with this Opinion.

ALL CONCUR.

BRIEFS FOR APPELLANT
BOWLIN GROUP, LLC:

David D. Black
Jeremy S. Rogers
Louisville, Kentucky

BRIEF FOR APPELLEES
CHRISTINA REBENNACK,
INDIVIDUALLY, AS PERSONAL
REPRESENTATIVE OF THE
ESTATE OF JOEL REBENNACK,
AND AS MOTHER AND NEXT
FRIEND OF ELIJAH REBENNACK;
MELANIE REBENNACK; AND
ARIANNA REBENNACK:

Charles L. Hinegardner
Sarah M. Houseman
Cincinnati, Ohio

BRIEFS FOR APPELLANTS
CHRISTINA REBENNACK,
INDIVIDUALLY, AS
ADMINISTRATRIX OF THE
ESTATE OF JOEL REBENNACK,
AND AS MOTHER AND NEXT
FRIEND OF ELIJAH REBENNACK;
MELANIE REBENNACK; AND
ARIANNA REBENNACK:

Charles L. Hinegardner
Sarah M. Houseman
Cincinnati, Ohio

BRIEF FOR APPELLEE
WESTCHESTER FIRE INSURANCE
COMPANY:

Steven T. Usdin
New Orleans, Louisiana

Griffin Terry Sumner
Allison W. Weyand
Louisville, Kentucky