RENDERED:  APRIL 7, 2023; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2022-CA-0419-MR

TYLER STEVEN BERWANGER                                    APPELLANT

APPEAL FROM FAYETTE CIRCUIT COURT
v.                HONORABLE KATHY STEIN, JUDGE[1]
ACTION NO. 20-CI-02953

MEAGAN ELIZABETH
BERWANGER                                                        APPELLEE

OPINION AND ORDER
AFFIRMING

** ** ** ** **

BEFORE:  ACREE, EASTON, AND JONES, JUDGES.

EASTON, JUDGE:  The Appellant, Tyler Steven Berwanger ("Tyler"), seeks

review of two decisions of the Fayette Family Court regarding division of marital

---

[1] Judge Kathy Stein retired and was replaced by Judge Carl Devine.  The current judge of the originating division of the Fayette Circuit Court for this case is Judge Tiffany Yahr.

property and debt.  First, Tyler argues the family court erred in awarding the Appellee, Meagan Elizabeth Berwanger ("Meagan"), the entirety of the marital residence and the furnishings therein.  Second, he argues the family court abused its discretion in its division of a portion of Meagan's student loan debt.  Finding no error, we affirm.

We will first address Meagan's motion to strike appellant's brief and to dismiss appeal based upon the deficiencies of Tyler's brief pursuant to RAP[2] 32(A)(3), (4), and 32(E).  An Appellant's brief must contain "[a] statement of the case consisting of a summary of the facts and procedural events relevant and necessary to an understanding of the issues presented by the appeal, *with ample references to the specific location in the record* supporting each of the statements contained in the summary."  RAP 32(A)(3) (emphasis added).  Tyler's brief contains no specific references to the record at all.  Additionally, the brief contains no statement of preservation as required by RAP 32(A)(4).  The brief also lacks an appendix containing the items required by RAP 32(E).

It would be well within our discretion to strike Tyler's brief and dismiss this appeal based on failure to comply with procedural requirements.  *Commonwealth v. Roth*, 567 S.W.3d 591, 593 (Ky. 2019).  Meagan is correct in that it is not our responsibility to search the record for errors.  When an appellant

---

[2] Kentucky Rules of Appellate Procedure.

fails to adhere to the procedural rules, our options are 1) to ignore the deficiency and proceed with the review, 2) strike the brief or its offending portions, or 3) to review the issues raised in the brief for manifest injustice only. *Hallis v. Hallis*, 328 S.W.3d 694, 696 (Ky. App. 2010).

Because the issues are essentially resolved from review of a single evidentiary hearing, the record is not particularly voluminous. While we choose to proceed with review, we do not condone the failure to comply with the briefing requirements. The brief filed by Tyler's counsel has earned the well-reasoned dissent in this case. The dissent should serve as a warning not to rely on the discretion of this Court to permit consideration of appeals despite deficient briefs. With hesitance, we hereby DENY Meagan's motion to strike, but this decision should not be viewed as precedential.

## FACTUAL AND PROCEDURAL HISTORY

Tyler and Meagan were married in 2014. They have one minor child, R.B., who was born in 2019. Throughout the marriage, they lived in Fayette County. The parties purchased their marital home in late 2018 using funds Meagan received from an inheritance from her grandfather's estate.

The parties separated in August 2020. The event precipitating this separation led to issuance of a domestic violence order against Tyler. At the hearing about this event, the family court heard testimony that Tyler had a firearm

-3-

and was threatening suicide while he was alone in the home with R.B. Tyler was required to vacate the parties' marital home. Meagan was granted temporary sole custody of R.B. The later permanent custody determination was not appealed by Tyler.

The family court conducted a final hearing on June 8, 2021. The parties were the only witnesses to testify. Meagan testified she was the primary wage earner during the marriage. There were periods of time when Tyler was unemployed or only working part-time. Meagan said when she was working, Tyler would care for the child, although she had serious concerns over the quality of that care.

Meagan confirmed she received a sizeable inheritance from her grandfather's estate during the marriage. The total inheritance was $342,283.07, which was given to her in two payments. The first check was written to her on November 11, 2017, for $100,000, with the balance being distributed to her on May 17, 2018. These payments were deposited into a new joint account Meagan opened. Meagan testified very little else went into that account. According to Meagan, Tyler made two deposits into the account, one for $100 and another for $250. Tyler's testimony was consistent with Meagan's regarding this account.

On December 12, 2018, a check for $120,000 was written from that account to purchase the parties' marital residence. The $120,000 was the full

purchase price of the home, and the parties did not execute a mortgage or any other type of loan. There were no liens on the house.

Meagan testified the house required a new HVAC unit, which cost approximately $7,000. Meagan obtained a loan from her sister for this expense, which has yet to be repaid. A dishwasher was installed, for which Meagan used money from her inheritance. Meagan and Tyler purchased a shed for the yard, at a cost of approximately $3,500. Meagan testified they used tax refund and stimulus money to pay for the shed.

Meagan remembered that within weeks after she received the first installment of the inheritance, Tyler quit his job. Tyler explained he could not keep the jobs and go on all the trips they were planning to be financed with the inheritance money. Tyler did not seek reemployment for several months. Tyler did not get another job until March 2018. Meagan said Tyler was unemployed again from fall 2019 until March 2020, when he began driving for Grubhub,[3] making approximately $100 per week. Tyler obtained another job a few months later.

Meagan observed Tyler did not seem concerned about employment, because he thought they could just use her inheritance money. She testified he often wanted to use this money for unnecessary expenses. Meagan testified that

---

[3] A food delivery service.

even when Tyler wasn't working, he would not contribute much to household duties. This was a source of contention between them because Meagan would ask Tyler to do the chores around the house he agreed to do, but she would end up doing most of them.

Meagan additionally testified about the debts of the parties. They had debt on both of their vehicles, as well as some credit card debt, medical debt from when their son was born, and Meagan had about $40,000 in student loans. Meagan testified that the credit card debt was all incurred by Tyler. Meagan stated they only opened the card to get some credit established. Meagan charged about $300 on it right after they opened the card, but she paid it off in full and never used it again. After the parties separated, Meagan received notification the card was "maxed out." Meagan theorized Tyler began using the credit card when she kept him from using her inheritance money.

Meagan testified they owed about $12,300 in medical debt from her hospital stay and their son's NICU stay when he was born. She stated she had insurance, which paid for most of the cost. Meagan testified Tyler told her that he also had insurance, but that turned out to be incorrect. Tyler disputed that he intentionally misrepresented his health insurance status to Meagan. He testified he did not know if he had health insurance or not, and he did not find out for sure until the hospital attempted to run his information.

Meagan owed approximately $40,000 in student loan debt. She said that about $10,000 of the loan was not used for educational expenses, but for living expenses for the parties during the marriage. According to Meagan, Tyler had encouraged her to take out the maximum amount of loans she could so that they would have extra funds.

Tyler did not dispute that some of Meagan's student loans went to pay for marital expenses. He stated he does not believe it was as much as $10,000, but he was unable to give an amount that he thought was more accurate. He also testified he never coerced Meagan in any way to take out extra loans, but he did agree that he encouraged it.

Tyler testified he has very few assets. When he had to leave the marital residence, he began staying with a friend in a garage, which is where he was still residing at the time of the hearing. He stated it has been difficult for him to save money, due to the child support and other bills he must pay. Tyler asked the family court to grant him maintenance, because he was unable to meet his daily living expenses.

The family court issued its findings of fact, conclusions of law, and decree of dissolution of marriage on March 21, 2022. The family court found the marital residence was purchased with nonmarital funds, and it found no marital equity in the home. It granted the entirety of the home to Meagan, along with the

furnishings in the home. The family court found that marital funds were only used on the purchase of the shed, but no evidence was presented that the shed increased the value of the property.

The family court granted each party the vehicle in their respective possession at the time of the hearing, as well as their individual bank accounts and any personal property in their possession. The family court divided the medical debt between the parties. The family court reiterated its previous order that required Tyler to be responsible for the credit card debt. The family court denied Tyler's request for maintenance and found his income to be substantially like Meagan's. Finally, the family court found that $10,000 of Meagan's student loan debt was used to pay marital expenses. It ordered Tyler to be responsible for $5,000 of that debt, while Meagan was responsible for the remainder of the $35,000 debt.

**STANDARD OF REVIEW**

Property distribution awards in dissolution of marriage actions are reviewed for abuse of discretion. *McGregor v. McGregor*, 334 S.W.3d 113, 118-19 (Ky. App. 2011). "The test for an abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound reasonable principles." *Penner v. Penner*, 411 S.W.3d 775, 779-80 (Ky. App. 2013). Appellate review of a trial court's factual findings is governed by the

clearly erroneous standard; factual determinations supported by substantial evidence will not be disturbed. *Truman v. Lillard*, 404 S.W.3d 863, 868 (Ky. App. 2012). In evaluating abuse of discretion, this Court reviews legal conclusions applied by the trial court *de novo*. *Ehret v. Ehret*, 601 S.W.3d 508, 511 (Ky. App. 2020).

## ANALYSIS

Tyler's first contention of error is that the family court abused its discretion in its division of the parties' marital and nonmarital property. Tyler specifically takes issue with the family court's award of the entirety of the marital home to Meagan. The marital residence in question is a house located in Lexington, which was purchased in 2018. The parties had been married for a little over four years when this residence was purchased. Prior to purchasing the home, the parties rented an apartment as their residence. The home was purchased outright with funds from an inheritance Meagan received from her grandfather's estate.

KRS[4] 403.190 controls the disposition of property in a dissolution of marriage action. It states: "(2) For the purpose of this chapter, 'marital property' means all property acquired by either spouse subsequent to the marriage except: (a) Property acquired by gift, bequest, devise, or descent during the marriage and

---

[4] Kentucky Revised Statutes.

-9-

the income derived therefrom unless there are significant activities of either spouse which contributed to the increase in value of said property and the income earned therefrom[.]"  There is a presumption that all property acquired during a marriage is marital unless the property can be shown to have originated in one of the exceptions of KRS 403.190(2). *Terwilliger v. Terwilliger*, 64 S.W.3d 816, 820 (Ky. 2002).  A party claiming that property acquired during the marriage is nonmarital property has the burden of proof. *Id.*  The burden of proof is that of clear and convincing evidence. *Browning v. Browning*, 551 S.W.2d 823, 825 (Ky. App. 1977).  The family court found the funds Meagan inherited from her grandfather clearly fall into the exception of KRS 403.190(2)(a).

Tyler does not dispute that the house was purchased with these funds. Meagan provided copies of the checks she received from the estate, where they were deposited, and that the check written for the house came from that account. The parties were able to purchase the house outright, without a mortgage, due to these funds.  Despite this, Tyler claims Meagan failed to provide adequate "tracing" evidence that the property was nonmarital.

In *Turley v. Turley*, 562 S.W.2d 665, 668 (Ky. App. 1978), this Court ruled it was error to grant property to a party as nonmarital when that party was unable to show that the property currently owned was acquired by use of his

inheritance. Tyler contends this case is controlling, and Meagan is unable to trace the house and the items inside to her nonmarital assets. We disagree.

In *Turley*, the parties were married for twenty-three years, and they used the inheritance money throughout the long marriage. It could not be determined by the time of dissolution what specific assets were purchased with said inheritance. *Id.* That is not the case here. Meagan and Tyler were married for six years but did not purchase the house until approximately a year and a half prior to their separation. They purchased the house less than a year after Meagan received the balance of the inheritance. Meagan provided evidence, both in her testimony and in the form of checks and deposits, that the house was purchased solely with her inheritance.

Tyler appears to make the argument that he should get some credit for improvements to the home. He might have been correct, had he provided any evidence that he contributed to the improvements or that the improvements increased the value of the home. The parties both testified the improvements to the home included a new HVAC unit, a dishwasher, and a shed. Meagan testified that the HVAC unit was paid for by a loan from her sister, and the dishwasher was purchased with funds from her inheritance. Tyler provided no evidence or testimony to the contrary.

According to the parties' testimony, the shed was purchased with tax refund and stimulus money. They testified the cost of the shed was $3,500, and Tyler testified they paid another $500 for gravel and concrete underneath the shed. This would arguably be marital property, but no testimony or evidence was provided to show it increased the value of the home in any way.

"When the property acquired during the marriage includes an increase in the value of an asset containing both marital and nonmarital components, trial courts must determine from the evidence '*why* the increase in value occurred' because 'where the value of [nonmarital] property increases after marriage due to general economic conditions, such increase is not marital property, but the opposite is true when the increase in value is a result of the joint efforts of the parties.'" *Travis v. Travis*, 59 S.W.3d 904, 910 (Ky. 2001). Thus, if Tyler had shown the family court that the shed increased the value of the home, he would have been entitled to a portion of the increase. Again, Tyler provided no evidence of the value of the home at all, with or without the added shed. We conclude the family court's findings and award of the marital residence to Meagan as her nonmarital property was not an abuse of discretion.

Tyler also disputes the family court's order that Meagan should receive all the furniture and home furnishings as nonmarital property. Meagan testified everything in the home was either purchased with her inheritance funds or

was given to them by her family members, either as a gift or second-hand. Tyler disagreed with this testimony and stated that some of the furniture was purchased prior to the purchase of the home with marital funds. Tyler did not specify what items of furniture or furnishings should be considered marital. He provided little testimony as to the household furnishings at all. Tyler's testimony on personal property mainly revolved around collectibles that had been accumulated throughout the marriage.

The family court found Meagan and Tyler had very little marital property. "A trial court is to divide marital property in just proportions considering all relevant factors." *Croft v. Croft*, 240 S.W.3d 651, 655 (Ky. App. 2007). "However, just proportions does not necessarily mean equal proportions." *Id.* The family court here granted each party the vehicle (and associated debt) in their possessions, as well as their individual bank accounts and personal belongings in their possession. Tyler argues the family court erred in this because no evidence was given as to value, but Tyler failed to offer any evidence or testimony of his own regarding value of these items. Tyler asks this Court to disturb the family court's findings, but he makes no specific requests as to what exactly he should have been awarded.

KRS 403.190 sets out several factors in considering the division of

marital property, including:  a) Contribution of each spouse to acquisition of the marital property, including contribution of a spouse as homemaker; b) Value of the property set apart to each spouse; c) Duration of the marriage; and d) Economic circumstances of each spouse when the division of property is to become effective, including the desirability of awarding the family home or the right to living therein for reasonable periods to the spouse having custody of the children.  KRS 403.190(1)(a)-(d).  The family court has wide discretion in dividing marital property based upon a proper consideration of these factors, and an appellate court should not disturb the family court's ruling on property division issues unless it finds the family court abused its discretion.  *Davis v. Davis*, 777 S.W.2d 230, 233 (Ky. 1989).

Tyler additionally disputes the family court's division of debt of the parties.  He specifically takes issue with the family court's finding that $10,000 of Meagan's student loan debt was not used for her personal education, but for marital living expenses.  Meagan testified at least $10,000 of her $40,000 student loan debt was taken out to be used for living expenses, at Tyler's encouragement.  He does not dispute that there was some amount taken out, and he does not deny encouraging Meagan to take out more than necessary for school expenses.  He did dispute the amount.  Tyler believed it did not reach the level of $10,000, but he was unwilling or unable to advise the court the amount he believed was correct.

Unlike assets, there is no presumption that debts incurred during the marriage are marital. *Maclean v. Middleton*, 419 S.W.3d 755, 773 (Ky. App. 2014). The party claiming that a debt is marital in nature has the burden of proof. *Id.* In making this determination, the family court should consider several factors, such as receipt of benefits, extent of participation, whether the debt was incurred to purchase marital assets, whether the debt was necessary to provide for the family, and the parties' economic circumstances. *Id.*

It is true a professional degree cannot be considered marital property. *Inman v. Inman*, 648 S.W.2d 847 (Ky. 1982). This Court has further ruled that the debt associated with the acquisition of a nonmarital asset should be borne by the party who will benefit from it. *Van Bussum v. Van Bussum*, 728 S.W.2d 538, 539 (Ky. App. 1987). However, the family court did not divide the entirety of Meagan's student loans. The family court found that $10,000 of Meagan's $40,000 student loan was for marital purposes and spent on marital expenses. Because that portion of the debt benefitted both parties equally, it was assigned equally. The family court did not abuse its discretion in assigning half of that amount to Tyler.

In his brief, Tyler claims the trial court's decisions were unreasonable because "[t]he nonmarital nature of the items were not agreed upon by Tyler, Tyler's testimony regarding the marital nature of marital residence was ignored"

and "[t]his matter is a clear and obvious case of favoritism being executed by the Trial Court[.]"[5]  These arguments are not supported by evidence.

"A family court operating as finder of fact has extremely broad discretion with respect to testimony presented, and may choose to believe or disbelieve any part of it.  A family court is entitled to make its own decisions regarding the demeanor and truthfulness of witnesses, and a reviewing court is not permitted to substitute its judgment for that of the family court, unless its findings are clearly erroneous." *Bailey v. Bailey*, 231 S.W.3d 793, 796 (Ky. App. 2007). Despite Tyler's protests, none of the findings of the family court were clearly erroneous.  Tyler failed to dispute much of Meagan's testimony, and when he did, his testimony was unclear and at times hard to follow.

## CONCLUSION

Having reviewed the record in its entirety, we conclude the Fayette Family Court's findings of fact are supported by the evidence and thus not erroneous.  The family court committed no error of law and properly acted within its discretion.  The Fayette Family Court is AFFIRMED.

JONES, JUDGE, CONCURS.

ENTERED: _____      _____
                                JUDGE, COURT OF APPEALS

_____

[5] Appellant's brief, pages 4 and 5.

-16-

ACREE, JUDGE, CONCURS IN PART, DISSENTS IN PART, AND FILES SEPARATE OPINION.

ACREE, JUDGE, CONCURRING IN PART, AND DISSENTING IN PART:  I concur in the well-reasoned Opinion.

However, I write separately to record my dissent from the order denying this appellee's motion to strike the appellant's brief, allowing the Court to consider it as if it substantially complied with the appellate rules.  It does not.  I also write for a correlative, but more important reason – to criticize this Court's practice of passing to the merits panel motions to strike briefs.

For years this Court and the appeals process itself has been plagued by appellate advocates who fail to follow rules.  Noncompliance with these rules is a significant reason the wheels of justice grind so slowly.  As the majority Opinion notes, appellant's counsel violated several of our rules.  He thus gambled his client's right to appellate review on the magnanimity of this Court.

Since rendition of *Hallis v. Hallis*, 328 S.W.3d 694 (Ky. App. 2010), the trend of appellate advocates disregarding rules – and thus disrespecting the appellate courts themselves – has drawn more and more attention.  A decade after *Hallis*, this Court documented the alarming increase in the number of appellate opinions in which "an attorney's carelessness made appellate rule violations an issue in his or her client's case."  *Clark v. Workman*, 604 S.W.3d 616, 616 (Ky. App. 2020); *see also id.* at 616-18 nn.1-4.  We said then that "[i]f this is not a crisis

-17-

yet, it soon will be if trends do not reverse." *Id.* at 618; *see Koester v. Koester*, 569 S.W.3d 412, 414 (Ky. App. 2019) ("we cannot tolerate his total disregard of . . . appellate procedure").

The Supreme Court took the reins of this problem in *Commonwealth v. Roth*, 567 S.W.3d 591 (Ky. 2019). The Commonwealth's rules violations in that case, similar to those in this case, led to the Court's exercise of "discretion to strike the Commonwealth's brief, which *necessarily* requires that we also dismiss the Commonwealth's appeal." *Id.* at 593 (emphasis added) (footnote omitted). But the opinion is significant also for its advice – or warning – to appellate jurists. The Supreme Court said, "It is a *dangerous precedent to permit* appellate advocates to ignore procedural rules." *Id.* (emphasis added). I still fear that permitting appellate advocates to ignore procedural rules is becoming that dangerous precedent.

Soon after *Roth*, the Supreme Court again warned practitioners that "failure to comply with rules governing appellate briefs is a habit to avoid. Failure to comply with these rules misplaces those 'lights and buoys to mark the channels of safe passage,' . . . and in the future may well warrant dismissal of an appeal." *Commonwealth v. Hensley*, 655 S.W.3d 122, 127-28 (Ky. 2022) (quoting *Roth*, 567 S.W.3d at 596).

-18-

The Supreme Court also warned this Court against applying manifest injustice review to cure every case infected with rules violations. Under appropriate circumstances, manifest injustice review might be granted. That has been so since adoption of the civil rules. *Collins v. Sparks*, 310 S.W.2d 45, 48 (Ky. 1958) (citing CR[6] 61.02). However, our Supreme Court made it clear in *Ford v. Commonwealth* "that the manifest injustice standard of review is reserved only for errors in appellate briefing related to the statement of preservation." 628 S.W.3d 147, 155 (Ky. 2021) (citing CR 76.12(4)(c)(iv), now RAP[7] 32(A)(4)). This is a stand-alone discretionary cure for a stand-alone violation expressly applicable when a trial court commits a palpable error, CR 61.02 and RCr[8] 10.26, not when an advocate violates other appellate rules.

Those other appellate rules violations are subject to different, often harsher, sanctions than manifest injustice review. Compelling appellate rule compliance is the purpose of these sanctions. They should be applied liberally to assure it. The current rule, RAP 10, reflecting its predecessor CR 73.02(2), says:

> the failure of a party to substantially comply with the rules is ground for such action as the appellate court deems appropriate, which may include:

---

[6] Kentucky Rules of Civil Procedure.

[7] Kentucky Rules of Appellate Procedure.

[8] Kentucky Rules of Criminal Procedure.

(1) A deficiency notice or order directing a party to take specific action,

(2) A show cause order,

(3) Striking of filings, briefs, record or portions thereof,

(4) Imposition of fines on counsel for failing to comply with these rules of not more than $1,000,

(5) A dismissal of the appeal or denial of the motion for discretionary review, and

(6) Such further remedies as are specified in any applicable rule.

RAP 10(B). The enhancement of penalties from the former sanctions rule to the current one, adopted by the Supreme Court, is further indication of the sharper focus on the appellate courts' expectations of attorney competence.

That brings me to the appellee's motion in this case to strike the brief.

When the appellee filed her motion to strike the appellant's brief, and when a different panel of this Court considered the motion, the appellee's brief was not yet due. Clearly, this is the appropriate and efficient time to file such a motion. If this Court had granted the motion then,[9] the appellant would have had the opportunity to correct the deficiencies with little disruption. Had the deficiencies

---

[9] An order denying the motion would have been interlocutory, subject to the merits panel's revisiting the motion, and ruling as it effectively did that the brief was not substantially compliant. There is no virtue or benefit to the Court or to the parties in the motions panel's passing the motion; rather, as discussed, doing so deprives the merits panel of the opportunity to consider independently the motion to strike and motion to dismiss.

gone uncorrected, dismissal could have been revisited as an appropriate additional sanction, saving the movant a waste of time and money defending the judgment by briefing the case, and preserving this Court's limited resources. If the motion was granted and the deficiencies corrected, then the wheels of justice would have been properly greased, resulting in less taxation of those judicial resources.

In this case, the appellee sought both to strike appellant's brief and to dismiss the appeal, claiming the violations were "the exact same errors in briefing" as in *Miller v. Armstrong*, 622 S.W.3d 661 (Ky. App. 2021). Indeed, appellee's claim is hard to refute. However, "dismissal for failure to comply with the [appellate rules] is discretionary rather than mandatory." *Sanderson v. Commonwealth*, 291 S.W.3d 610, 612 (Ky. 2009) (quoting *Simmons v. Commonwealth*, 232 S.W.3d 531, 533 (Ky. App. 2007)). In both the instant case and *Miller*, the motion panel passed both the motion to strike and the motion to dismiss to the merits panel. Passing the motions delayed their consideration until briefing was complete. It effectively relinquished the Court's ability to consider the motion to strike without also dismissing the appeal as *Roth* requires post-briefing. 567 S.W.3d at 593 (when case is ripe to consider the merits, striking brief necessarily requires dismissal).

Allowing the appellant, at the post-briefing stage, to amend his brief without dismissing would necessarily require the Court to grant the appellee the

same privilege of amending appellee's brief. *Roth* disallows that course, appropriately so. Therefore, I cannot criticize the majority for declining, at this stage, to strike the brief for it would necessarily require dismissing the appeal.

When the motion panel passed appellee's motion to the merits panel, it raised the stakes for everyone.

This Court's motions panels need not consider striking a brief with the same caution as that required when dismissing an appeal. Even when both sanctions are sought together, as here, a motion panel is not prohibited from considering these sanctions disjunctively, for obvious reasons. Dismissing ends an appeal and prompts a new set of appellate rights. But consider the benefits of striking a brief with leave to amend.

First, the inexperienced counsel will be given yet another opportunity to learn proper appellate advocacy, a skill which he or she may be practicing for the first time since law school. Second, it will flush out appeals that, while not determinatively frivolous, are pursued and minimally briefed to secure a bargain or maintain a status quo, rather than to correct the trial court by revealing or advancing our jurisprudence in a way that favors a worthy appellate advocate's client. Third, the opinions of this Court will improve, either in quality or expedition, when the briefs designed to inform and persuade us are optimized by compliance with the rules the Supreme Court mandates.

For these reasons, I concur in the Opinion and dissent from the order.

BRIEF FOR APPELLANT:            BRIEF FOR APPELLEE:

Alexander A. Ferrara           Ann D'Ambruoso
Lexington, Kentucky            Lexington, Kentucky